~~HIGHLY CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER~~
~~OUTSIDE ATTORNEYS' EYES ONLY~~

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

## EXPERT REPORT AND DECLARATION OF
## JOSEPH C. McALEXANDER III
## DATED DECEMBER 2, 2013

**AMY ROTHBAUM, individually and on behalf of others similarly situated**

**vs.**

**SAMSUNG TELECOMUNICATIONS AMERICA, LLC**

**Case No. 11-CV-10509-MLW**

**December 2, 2013**

Redacted for Public Docket

~~CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER~~
~~OUTSIDE ATTORNEYS' EYES ONLY~~

# TABLE OF CONTENTS

1   INTRODUCTION _____ 1

2   QUALIFICATIONS _____ 4

3   OTHER CASES _____ 6

4   COMPENSATION _____ 6

5   DOCUMENTS AND OTHER MATERIAL CONSIDERED _____ 6

6   OPINIONS _____ 7

  6.1   General Background of Cellular Phone Technology _____ 7

  6.2   General Background of Manufacture and Distribution of Complex Technology _ 11

  6.3   The i897 Phone _____ 13

     6.3.1   Samsung Captivate i897 Phones were Widely Accepted and Acclaimed ___ 13

  6.4   Activity in Sleep Mode_____ 15

  6.5   Power On/Off CTI (Customer Trouble Indicator)_____ 16

  6.6   The Rothbaum Phone _____ 16

  6.7   The Complaint _____ 20

  6.8   The Thompson Tests _____ 21

  6.9   The Thompson Opinions _____ 28

  6.10  The Chung Tests _____ 31

  6.11  Proposed Tests to Determine Cause of Alleged Failure, if any _____ 31

7   FINDINGS AND SUMMARY OF OPINIONS _____ 32

8   EXHIBITS TO BE USED AS SUMMARY OF OR SUPPORT FOR OPINIONS____ 34

9   CONCLUDING REMARKS _____ 35

Attachment A        Curriculum Vitae and Other Cases _____ 35

Attachment B        Consumer Reports, Volume 76, No. 1 (January 2011) at 33_____ 35

Redacted for Public Docket

~~HIGHLY CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER OUTSIDE ATTORNEYS' EYES ONLY~~

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| AMY ROTHBAUM, individually and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>SAMSUNG TELECOMUNICATIONS AMERICA, LLC,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No.  11-CV-10509-MLW |

## EXPERT REPORT AND DECLARATION OF
## JOSEPH C. MᶜALEXANDER III
## DATED DECEMBER 2, 2013

# 1    INTRODUCTION

1.    I have been retained by Choate, Hall and Stewart LLP, counsel for the Defendant Samsung Telecommunications America LLC, (hereinafter referred to as "STA") to review the facts relating to complaints of Breach of Implied Warranty of Merchantability, pursuant to Gen. Mass. Ann. Laws Ch. 106, § 2-314, Violation of Massachusetts Consumer Protection Act, M.G.L. c. 93A, §§ 2 and 9, and Breach of Implied Warranty of Merchantability, pursuant to Tex, Bus. & Com. Code § 2.314, a putative Class Action complaint brought against the Defendant by Amy Rothbaum individually and on behalf of others similarly situated (hereinafter "Rothbaum" and "Others" respectively).

Redacted for Public Docket

~~HIGHLY CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER~~
~~OUTSIDE ATTORNEYS' EYES ONLY~~

2.      I was requested to review and then to provide expert opinion as to deposition

testimony and documents produced to date in this case, such as:

1)   the Declaration of Amy Rothbaum;[1]

2)   documents produced by STA concerning the Samsung Captivate i897
     Phones;[2]

3)   the deposition of Ken Thompson;[3]

4)   the deposition of Amy Rothbaum;[4]

5)   the Ken Thompson test report (hereinafter the "Thompson Report);[5]

6)   the Matthew Chung test report (hereinafter the Chung Report);[6]

7)   Plaintiff's Notification of Violation of M.G.L. c. 93A, May 17,
     2011;[7]

8)   STA Response to Chapter 93A Demand Letter Sent on Behalf of
     Amy Rothbaum, June 15, 2011;[8] and

9)   the Second Amended Complaint.

3.      After review of these documents and testimony, my observations are:

1)   it has not been determined that there is one and only one cause for
     the Power On/Off in sleep mode of a Samsung Captivate i897 phone;

2)   the cause of the alleged Power On/Off in sleep mode of Amy
     Rothbaum's Phone, purchased from AT&T on October 16, 2010, in
     Holyoke, Massachusetts, has not been determined, and it has not
     been determined that the phone is defective;

3)   the cause of the alleged Power On/Off in sleep mode of Amy
     Rothbaum's Phone received as an exchange replacement from AT&T

---

[1] Declaration of Amy Rothbaum, NO. 11-CV-10509-MLW.
[2] STA_ROTH 0000001-602.
[3] Deposition of Ken Thompson, Nov. 22, 2013, NO. 11-CV-10509-MLW.
[4] Deposition of Amy Rothbaum, Nov. 20, 2013, NO. 11-CV-10509-MLW.
[5] Confidential Expert Report of Ken Thompson Pursuant to Fed, R, CIV P. 26(a)(2), No. 11-CV-10509-MLW.
[6] Senior Engineer's Report on the Testing of Amy Rothbaum's smart phone, No. 11-CV-10509-MLW.
[7] Notification of Violation of M.G.L. c. 93A, May 17, 2011.
[8] Response to Chapter 93A Demand Letter Sent on Behalf of Amy Rothbaum, June 15, 2011.

Redacted for Public Docket

~~HIGHLY CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER~~
~~OUTSIDE ATTORNEYS' EYES ONLY~~

on or about March 1, 2011, in Holyoke, Massachusetts, has not been determined, and it has not been determined that this phone is defective;

4)   no other person has been identified who has experienced Power On/Off in sleep mode of a Samsung Captivate i897 phone received in exchange replacement of a Samsung Captivate i897 phone that exhibited Power On/Off in sleep mode;

5)   it has not been determined that the cause of a Power On/Off in sleep mode of any other identified user's original Samsung Captivate i897 phone and replacement Samsung Captivate i897 phone are the same; and it has not been determined that any such common cause is the same as the shared common cause of the Power On/Off in sleep mode of Amy Rothbaum's Phones received from AT&T; and

6)   the documents produced by STA demonstrate that only a small percentage of the i897 phones have experienced a power-down problem in sleep mode.

4.   In connection with providing my opinions, I have further been asked to provide an overview of the technology, manufacture, and distribution of complex electronic products including cellular phones. I understand that I may be called to assist the Court by providing a tutorial. In this report, I will discuss the technology including aspects relating to after sale failures, failure analysis, and corrective action in the manufacture and distribution of these products.

5.   I expect to be called to provide expert testimony, both at deposition and at trial, regarding my opinions and any other matters set forth in this report. Opinions formed are covered below in **Section 6**. I understand that I may be asked to further elaborate on these positions and to provide opinions on other issues. I reserve the right to form and report such additional opinions.

Redacted for Public Docket

~~HIGHLY CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER~~
~~OUTSIDE ATTORNEYS' EYES ONLY~~

## 2    QUALIFICATIONS

6.      My name is Joseph C. M<sup>c</sup>Alexander III, President of M<sup>c</sup>Alexander Sound, Inc., located at 101 W. Renner Rd., Richardson, TX 75082.  I am over eighteen years of age and I would be competent to testify as to the matters set forth herein if I am called upon to do so.

7.      I am a technical expert in the subject matter areas relevant to this Class Action complaint as amended, including cellular phone communication protocols and operation, information storage and transfer, user interfaces, information signal processing, applications and operating systems, battery charging and circuit powering, and electronic device hardware and firmware design and control.  I am qualified to reach the opinions and conclusions stated in this report.

8.      In forming my opinions, I rely on my knowledge and experience in the fields relevant to this Class Action complaint as amended.  I further rely on documents and information referenced in this report.

9.      I am a Registered Professional Engineer (#79454) and hold a Bachelor of Science degree in Electrical Engineering from North Carolina State University.  I have been associated with the integrated circuit and electronics industry as a designer and consultant for the past 40 years and am a named inventor on 31 U.S. patents and a number of foreign patents, some of which are directly related to the design and operation of communication, operation, and control systems, including using wireless technology such as cellular phones.

10.      My skills and experience are in areas of circuit design and analysis, device fabrication and assembly, testing, marketing, control system design and analysis, manufacturing

Redacted for Public Docket

~~HIGHLY CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER~~
~~OUTSIDE ATTORNEYS' EYES ONLY~~

operations, software development, management, and respective areas of quality, reliability, and

defect/failure analysis. Specifically, I have:

> designed memories, including Dynamic Random Access Memories (DRAMs), Static Random Access Memories (SRAMs), Charge Coupled Devices (CCDs), Shift Registers (SRs), and functional circuits including I/O buffers for address and data, decoders, clocks, sense amplifiers, fault tolerant (incorporating both non-volatile EPROM and random access memory components), parallel-to-serial data paths for video applications, level shifters, converters, pumps, and logic, as well as wireless communication systems and MEMs;

> managed operations including engineering, training, and quality assurance for device fabrication, assembly, test, analysis, and reliability assessment, as well as manufacturing control, each of which involved both volatile and non-volatile memory; testing, analysis, and control involved use of mechanical calibration and measuring equipment, including optical, scanning e-beam, IR, capacitive, and laser using phase contrast and FFT for HARI applications;

> taught courses in solid-state device physics, integrated circuit design, integrated circuit fabrication, and statistical control;

> provided expert services, investigating both process and design technologies of various devices (microprocessor and controller, volatile and non-volatile memory, programmable logic, card, tag, module, mixed signal, custom, and other), systems (PC and peripheral, computer, control, laser measurement, switch, architecture, software, and other), and consumer products (medical, TV, telephone, VCR, facsimile, copier, lighting, game, and other); and

> designed and managed development, testing, and evaluation of memory devices and systems incorporating such devices, including simulation of operation. I have also had experience in programming, erasing, and wearout of electrically programmable and erasable non-volatile memories.

11.     Additionally, I have evaluated and provided expert services related to

Redacted for Public Docket

~~HIGHLY CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER~~
~~OUTSIDE ATTORNEYS' EYES ONLY~~

communication systems including communication protocol, data transport, query and reporting

operations and methods.   A more detailed account of my work experience and other

qualifications is listed in my Curriculum Vitae attached as **Attachment A** to this Report.

## 3    OTHER CASES

12.      A list of the cases during at least the last four years in which I have signed a

Protective Order, have testified as an expert either at a trial, hearing, or deposition, or have

submitted statements / opinions, is attached as **Attachment A** to this Report.

## 4    COMPENSATION

13.      I am being compensated for my work on this case through M$^{c}$Alexander Sound,

Inc., at $495 per hour.  No part of my compensation is dependent upon the outcome of this case

or any issue in it.

## 5    DOCUMENTS AND OTHER MATERIAL CONSIDERED

14.      STA has produced to the Plaintiff documents numbered STA_ROTH000001-602,

pursuant to the Court's Order relevant to the complaints filed by the Plaintiff.  I have relied on

these documents in forming my opinions.  STA produced these documents in response to the

Court's Order dated September 18, 2013, which directed STA to produce "all records that are

relevant to the statement in [Matthew Chung's] Report, at ¶8, that: 'The devices manufactured

in the changed component experienced few reported shutdowns of any type.  They have not

experienced reports of the symptoms alleged in the Plaintiff's complaint.'"  Further, in forming

my opinions, in addition to my knowledge and experience (as stated above), I have considered

Redacted for Public Docket

HIGHLY CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER—
OUTSIDE ATTORNEYS' EYES ONLY

the following:

1)   testing protocol and photos;

2)   deposition transcripts;

3)   the Complaint and declarations; and

4)   reports.

## 6    OPINIONS

### 6.1    General Background of Cellular Phone Technology

15.    Cellular Phones, and in particular so called smart phones, are complex electronic systems, each including a highly functional processor and operating system that can perform many of the functions associated with personal computers, such as running application programs. Each system has many components, including, in addition to the processor, communication devices, transmitters and receivers, power management circuits, one or more cameras, a display screen, graphics devices, microphones and speakers.  These components are manufactured by various component suppliers and assembled together by the smart phone manufacturer to function as a smart phone.  These components are compactly assembled by the smart phone manufacturer onto a small circuit board to fit into the hand held case of a cellular phone.

16.    These complex devices are constantly improved with new models typically introduced every one to two years; and although designed and fabricated to last for an extended time duration, the continued new model introduction gives each product a reasonably short product life for manufacture and sale, in some instances, of perhaps eighteen months.

17.    The number of units sold for a given model can be very large, several million units in that eighteen-month period.  A significant portion of those units are produced and

Redacted for Public Docket

~~HIGHLY CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER~~
~~OUTSIDE ATTORNEYS' EYES ONLY~~

distributed to be available in retail stock because of a high consumer interest when the model is first introduced.

18.     The electronic environment within the phone case and on the circuit board is prone to electronic noise susceptibility, not atypical for any electronic system, and especially true within a small enclosure.  The circuits, for example, are close to and must operate with an RF transmitter and power switching circuits to control power consumption and to extend the battery life.

19.     The programs executed in the highly functional processor and the controllers are responsive to inputs also subjected to a possible noisy electronic environment.   One of the functions controlled is power switching to preserve battery life and to reduce noise contribution during switching modes of operation, such as between active and standby modes.

20.     Each individual component has different manufacturing performance criteria and specification requirements.   Each is generally specified by the individual manufacturer as performing between an upper and a lower limit over a range of supply voltage(s) and temperature, but most are designed to operate in a typical operation range well inside the upper and lower limits.

21.     Combinations of component manufacturing variations can result in marginal compatibility issues that must be addressed to minimize the susceptibility to noisy inputs and outputs that can cause an error in the execution of an application program or an error in the actual operation of a component.

22.     Consumer products that are complex electronic systems are known to experience shut downs, freezes, and apparent failures to power up over a small percentage of each of the

Redacted for Public Docket

~~HIGHLY CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER~~
~~OUTSIDE ATTORNEYS' EYES ONLY~~

products.  Steps are taken to insure that the distribution of product is heavily weighted toward

excellent, continued performance, but perfection is statistically unattainable.  Thus, although

manufacturers continually improve product performance distribution during the design,

sampling, roll out, and life cycle of the product, problems still occur.  Examples include:

1) **Personal computers freeze (become non responsive) or lockup, blue screen, power off.**  The cause can be hardware, operation of the system (a particular routine or software run driver), a particular running application or combination of applications running in parallel, computer viruses, or various other sources of error.  Initial attempts to recover include a three key restart or a hard power off, but may require resetting the system with an accompanying loss of data.

2) **Cable DVRs are known to experience freezes during operation.**  For example, the user is watching a recorded program and the program freezes or malfunctions and the DVR is not responsive to the remote control.  The screen may freeze on an image or go blank.  At times this can be fixed by turning the system off and back on, however, at other times, the user will need to call the service support number.  The phone service tech will first ask to have the reset button pushed or the unit unplugged and plugged back in.  The unit is not generally replaced unless the problem cannot be remedied or reoccurs on a frequent basis.

23.     These failures can be repetitive or intermittent.  For software causes, the failure

could occur every time that program X is opened when program Y is running, or sometimes

much less frequently, perhaps once a month, while watching a recorded program the screen goes

black and the sound is off.  In addition, since both hardware and software problems can have the

same external display appearance (or lack thereof) and are often corrected by the same reboot

procedures, it is difficult to determine if a problem is caused by hardware or software without

extensive, sophisticated testing.  And that testing may necessarily involve modeling of the

conditions in order at best to point to one or more statistically significant, most probable causes.

Redacted for Public Docket

HIGHLY CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER
OUTSIDE ATTORNEYS' EYES ONLY

24.     In his deposition, Thompson testified that ███████████████

███████████████████████████

███████████████████████████
███████████████████████████
███████████████████████████
███████████████████████████
███████████████████████████
█████████[9]

25.     In addition, intermittent failures of complex electronic systems can first appear after extended periods of operation.  First, the system electronics age and, therefore, the performance of each component undergoes slow shifts with time, which can make the system more likely to fail in operation than it was at the time of manufacture and test.  Second, the system environment itself is changing.  There are, for example, new applications installed, revisions to the installed applications, revisions to the operating system, and unauthorized changes to the system such as by user rooting (disabling or replacing portions of the operating system) and, since there is internet connection, malware (malicious software).

26.     As a result, unfortunately, such equipment in operation by consumers will experience some level of failure.  Some of these are sufficiently infrequent that they are not an issue with the consumer, while others motivate the consumer to seek solutions consistent with the warranty.  For example, PC users have become accustomed to rebooting their PC if it freezes or unplugging their DVR if it freezes.

---

[9] *See* Deposition of Ken Thompson, Nov. 22, 2013, 91:4-11.

11-CV-10509-MLW, McAlexander Expert Report and Declaration 12/2/2013                    10

~~HIGHLY CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER~~
~~OUTSIDE ATTORNEYS' EYES ONLY~~

27.     A large volume of consumer devices in operation can cause even a reliable product to appear to have a problem.  If a consumer is told that the failure rate is only one in a hundred (1.0%), it may seem acceptable since the likelihood of failure is quite low.  However, since there may be a million units in use of a certain model, a 1% failure rate would result in ten thousand units experiencing the failure.  Although the failure rate is understood and is generally acceptable, an individual that experiences a failure may have a different perspective.

28.     As a result of the inevitable, low level of failure occurrence, a system of product warranty has become commonplace and accepted by consumers.  If one person purchases a unit that appears to have an operational problem, that person simply takes the product back to the store and receives a replacement product or has the product repaired.  In some cases, such as for a PC, one might contact the manufacturer and arrange to send the product directly back to the manufacturer for repair.

29.     To continue the example of Paragraph 27, a further aspect of the large volume of product produced for a given model is that one hundred of the ten thousand replacement units may also be defective.  One hundred consumers have bought a device, had it fail, have taken it back for replacement, and had the replacement unit fail.  However, they can still return that failed unit and have it replaced.  The probability of a third device failing is statistically quite remote.

### 6.2     General Background of Manufacture and Distribution of Complex Technology

30.     As the result of my work in the electronics industry (summarized above and set out in more detail in Attachment A), which includes work in manufacturing operations and

Redacted for Public Docket

~~HIGHLY CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER~~
~~OUTSIDE ATTORNEYS' EYES ONLY~~

quality analysis, I am familiar with the prevailing norm in the industry. Consumer products, like smart phones, are produced and sold in large volume. A particular model may have more than a million units produced. Because of consumer demand and short life cycles, manufacturers design products with as few a number of problems as foreseeable, build prototypes to test for unforeseen problems, and test the manufactured products to remove as many of the defective or marginal units before they ship to a consumer.

31.    After manufacture and test, the products are then packaged and shipped to distribution centers and then to retail stores where they are sold. Handling of the products after assembly and test until the products arrive to the consumer subjects the products to further chances that damage may occur, such as by electrostatic discharge.

32.    Some small percentage of products that pass all outgoing tests may still fail in operation. These products may be returned to the manufacturer for repair or replacement and are typically categorized according to the general indication of failure - whether that characterization of failure by the consumer is accurate or not. The manufacturer then rank orders the general categories, based on the number of products in each category (called a Pareto Chart), to determine the most prevalent, reported problem category. The reported, failed products are then analyzed using electrical and/or environmental testing to determine the root cause, or causes, of the failures. In many instances, a failure cannot be reproduced. In others, the cause(s) could be associated with an operation that most products have no difficulty performing. The cause may even be complex. For example, a failing circuit can generate higher than normal noise in a given situation, and when combined with an internal circuit that is atypically sensitive to that noise, the

Redacted for Public Docket

~~HIGHLY CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER~~
~~OUTSIDE ATTORNEYS' EYES ONLY~~

result may be an intermittent failure.   In this case, only products that have the particular combination of component performance issues will experience failure.

33.     If a root cause is determined, further experimentation may be performed to determine a possible design change that can fix or alleviate the problem or to determine a test to screen these products to prevent them from shipping to a consumer.   In the above example, several alternatives would be considered.   These include, but are not limited to:

1)   additional screening of any components identified as failing in the presence of atypically high noise environments to remove sensitive or atypical devices from the manufacturing flow;

2)   modification of noise suppression structures or devices to reduce the atypical noise; and

3)   some combination of the above.

34.     None of these "fixes" is absolute; and this fact is understood by product manufacturers and retailers.   Fixes reduce the occurrence of the problem.   Because there are many variables in the manufacturing process of a product (including the manufacture of individual components used in the products), as the volume of products manufactured increases, the occurrence of one or more defective products also increases.   Moreover, even if the individual components of a product are fully tested before assembly, the assembly process itself subjects the components to handling, including temperature cycling, static electricity, and other effects that can change each component's behavior in a system.

**6.3     The i897 Phone**

**6.3.1     Samsung Captivate i897 Phones were Widely Accepted and Acclaimed**

Redacted for Public Docket

~~HIGHLY CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER~~
~~OUTSIDE ATTORNEYS' EYES ONLY~~

35.    Many sources attest that the Samsung Captivate i897 Phones received wide acclaim and acceptance.   Some of these sources are summarized below in STA's letter to Plaintiff's counsel:[10]

> Millions of Samsung's Galaxy S Handsets are in use today, and millions of consumers have found them fit for their intended purpose.  Indeed, Samsung's Galaxy S Handsets consistently have won high ratings and positive reviews from industry experts.  The 2010 Consumer Reports smartphone ratings, for instance, rated the Galaxy S as "the best device across all wireless carriers."  *See* Consumer Reports, Volume 76, No. 1 (January 2011) at 33.[11]  The editors of CNET similarly have described Samsung's Captivate™ as "easily AT&T's best Android phone to date."  *See* Samsung Captivate Review (July 14, 2010), http://reviews.cnet.com/ smartphones/samsung-captivate-review?tag=mncol;lst;1#reviewPa ge1.  Thus, Samsung's Galaxy S Handsets provide excellent value to numerous consumers.[12]

---

[10] Footnotes cited below provide additional support/clarification to those identified in the STA letter to Plaintiff's counsel.

[11]*See* Attachment B.

[12] Among the many additional honors that have been awarded to Samsung's Galaxy S Handsets are the following: 1. Best Android Phones for Fall 2010 (Sept. 13, 2010), http://www.thestreet.com/storyll0858794/3/best-android-phones.html;

2. The Top 10 Everything of2010 (Dec. 9, 2010), http://www.time.com/time/specials/packages/article/0,28804, 2035319_2033840_2033837,00.html;

3. 10 Most Influential Android Devices of 2010 (Dec. 30,2010), http://www.pcworld.com/businesscenter/article/ 215205/10_most_influential_android_devices_of_2010.html?tk=hp_fv;

4. Top 5 Phones for Mainstreamers (Feb. 17, 2011), http://www.infosyncworld.com/reviews/cell-phones/top-5-phones-for-mainstreamers/11802.html.

*See also* the following current sources:  http://www.pcmag.com/article2/0,2817,2366803,00.asp; http://content.time.com/time/specials/packages/article/0,28804,2035319_2033840_2033837,00.html; http://www.networkworld.com/slideshows/2011/010111-android.html; http://www.youtube.com/watch?v=iHnpZKCPu-4; http://www.mobiletechreview.com/phones/Samsung-Captivate.htm ; http://www.androidcentral.com/samsung-captivate-review; http://www.digitaltrends.com/cell-phone-reviews/samsung-captivate-review/; http://pocketnow.com/android/samsung-captivate-review  http://www.mnn.com/green-tech/gadgets-electronics/stories/best-android-phones-for-2010.

Redacted for Public Docket

~~HIGHLY CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER~~
~~OUTSIDE ATTORNEYS' EYES ONLY~~

> Samsung's Galaxy S Handsets are sophisticated and complex electronic devices with computing and telecommunications capabilities far beyond those imaginable just a few years ago. Consumers have posted many favorable comments about them on message boards and user forums. Your Demand Letter refers to message boards and user forums that contain some unfavorable comments about Samsung's Handsets. It is not unusual that some unfavorable comments are posted about complex electronic devices. All such devices can be subject to occasional operability errors, shutdowns or other malfunctions depending on how they are used. Many of the competing manufacturers of smartphones have been the subject of unfavorable comments by consumers who believed the devices shut down randomly. *See*, e.g., http://www.htcforums.com/desire/6112-desire-shuts-down-random ly.html (HTC's Desire™ smartphone); http://reviews.cnet.com/ smartphones/motorola-droid-2-verizon/4852-6452_7-34147059-2. html (Motorola's Droid2™ smartphone); https://discussions. apple.com/thread/2073936?start=0&tstart=0 (Apple's iPhone™); https://discussions.apple.com/thread/2481946?start=0&tstart=0 (Apple's iPhone™); https://discussions.apple.com/thread/3412216? start=0&tstart=0 (Apple's iPhone™); http://discussions.nokia.com/ t5/Nseries-and-Symbian-Smartphones/Nokia-N8-00-keeps-turning -off/td-p/769384 (Nokia's NS-00™ smartphone); and http://www. howardforums.com/showthread.php/1619583-LG-ENV3-Shuts-off -randomly (LG's ENV3™ smartphone). The posting of these comments does not demonstrate that all handsets of these manufacturers are unfit for ordinary use. To the contrary, every day, millions of consumers make use of Samsung's Handsets and the handsets of its rivals.

I agree with this summary.

### 6.4   Activity in Sleep Mode

36.   A smart phone is commonly said to be in sleep mode when the screen is turned off, either manually or for lack of activity, to conserve battery life. However, as acknowledged by Rothbaum in her deposition, the phone is still actively searching for cell tower connectivity, searching for Wi-Fi connectivity, searching for Bluetooth connectivity, looking for email,

Redacted for Public Docket

~~HIGHLY CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER OUTSIDE ATTORNEYS' EYES ONLY~~

searching GPS location, and running any of hundreds of applications that are downloaded and active on the phone.

### 6.5    Power On/Off CTI (Customer Trouble Indicator)

37.     When smart phones enter the market, there are a small number of returns of the phones for any of a number of various reasons.   In the case of the Samsung Captivate i897 phone, AT&T received the returns and assigned them to particular categories, called CTI (Customer Trouble Indicator), based on the customer's description of the problem.  ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████[14]███████████████████████████████████

38.     ████████████████████████████████████████

████████████████████████████████████████████████████

████████████[15]

### 6.6    The Rothbaum Phone

39.     Rothbaum declares that she purchased a Samsung i897 Phone from an AT&T Wireless store in Holyoke, Massachusetts on October 16, 2010.[16]   This date is prior to the

---

[13] *See* STA_ROTH 000001.
[14] *See* SGH-MAX8998 Power-OFF, STA_ROTH 0000599-600.
[15] *See* 2. Corrective Action (Power Failure), STA_ROTH 0000175.

Redacted for Public Docket

~~HIGHLY CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER~~
~~OUTSIDE ATTORNEYS' EYES ONLY~~

identification and correction of the "ON/OFF" Problem that affected a small percentage of these products.[17] Rothbaum further declares that, after a period of 2.5 months in which she does not report any problem with the phone, her i897 Phone shut down while in sleep mode on or about January 3, 2011, and again during the week of January 17-21, 2011.[18]

40.     Rothbaum reported this problem to AT&T at some unspecified date and she was sent a replacement battery.  Rothbaum further declares that, when she used the replacement battery, her i897 Phone again shut down in sleep mode during the week of February 21-25, 2011.[19]

41.     Rothbaum declares she reported this problem to AT&T at the AT&T store where she purchased the i897 Phone on or about March 1, 2011, and received in exchange a working i897 Phone (hereinafter the "Rothbaum Phone").[20] █████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████[21]

42.     Rothbaum declares that the Rothbaum Phone shut down while in sleep mode on or about March 5, 2011, and at a later unspecified time.[22]  At that time however, Rothbaum did not report this problem to AT&T or STA and does not declare she requested a repair or

---

[16] See Declaration of Amy Rothbaum, No. 11-CV-10509-MLW 2, ¶3.
[17] See SGH-MAX8998 Power-OFF, STA_ROTH 0000599-600.
[18] See Declaration of Amy Rothbaum, No. 11-CV-10509-MLW 2, ¶¶5, 6.
[19] See Declaration of Amy Rothbaum, No. 11-CV-10509-MLW 3, ¶10.
[20] See Declaration of Amy Rothbaum, No. 11-CV-10509-MLW 3, ¶11-14.
[21] See STA_ROTH 0000602.
[22] See Declaration of Amy Rothbaum, No. 11-CV-10509-MLW 3, ¶15.

Redacted for Public Docket

~~HIGHLY CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER~~
~~OUTSIDE ATTORNEYS' EYES ONLY~~

replacement of the Rothbaum Phone.  Rothbaum instead took her Phone to an attorney and requested representation.[23]

43.    It is my understanding that, under the terms of the Warranty, Rothbaum had the option to return the Rothbaum Phone to AT&T and receive a replacement Phone.  In electing not to do so, Rothbaum failed to exhaust her options to mitigate any damage by exchanging the alleged failing phone with a working replacement phone.

44.    In a letter dated May 17, 2011, Rothbaum's attorney demanded relief for the alleged failure of the Rothbaum Phone on Rothbaum's behalf.

45.    In a letter dated June 15, 2012, less than 30 days after the date of, and receipt of, the demand letter, STA's attorney responded to the demand letter and, on behalf of STA, offered to replace the Rothbaum Phone with a fully functional i897 Phone, and further provided directions to expedite that replacement.  Rothbaum has failed to accept, even to today, this offer.

46.    Rothbaum continued to use her phone, failing to preserve it in the state in which it allegedly failed, until September of 2012.  Rothbaum stated, in her deposition:

> Q    Where is that phone, then, since the date your complaint was filed?
>
> A    It was in my possession until I was told it needed to be tested, at the end of --
>
> Q    You retained possession of the phone prior to initiating this complaint?  Sorry. After initiating this complaint, you retained possession of the phone?

---

[23] *See* Declaration of Amy Rothbaum, No. 11-CV-10509-MLW 4, ¶16.

Redacted for Public Docket

~~HIGHLY CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER~~
~~OUTSIDE ATTORNEYS' EYES ONLY~~

A    Yes.

Q    You did not provide it to your attorneys?

A    As of the complaint filing?

Q    As of the com -- the original complaint, this was filed in March 2011 --

A    No.

Q    -- did you continue to retain possession of your phone?

A    Yes.

Q    And you have retained possession of your phone until when?

A    It was September 2012.

Q    And did you use your phone from March 2011 until September 2012?

A    Yes, I did.[24]

47.    Rothbaum has failed to provide documentation of the alleged failure; in particular, Rothbaum has not provided information on the operating state of the phone at the time of the failure.  As explained above, although the screen is off in "Standby" or "Sleep" mode, the phone is not inactive.  One familiar with the operation of smart phones, for example, would understand that many operations continue, including some applications (apps) that may remain running in some reduced power mode based on whatever state the app was running at the time of entry into standby or sleep.  Thus the operating state, and degree of battery power drain, may be in part based on one or more of the following, as well as possible other reasons:

---

[24] Deposition of Amy Rothbaum, Nov. 20, 2013, NO. 11-CV-10509-MLW, 168:2-25.

Redacted for Public Docket

~~HIGHLY CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER~~
~~OUTSIDE ATTORNEYS' EYES ONLY~~

- the specific operating system and revision level;
- the revision of any firmware;
- the applications installed;
- the active applications at the time of change to a standby or sleep mode;
- state of activity on Wi-Fi and Bluetooth;
- state of GPS;
- carrier signal strength;
- any options or other information on the SIM card affecting operation;
- battery status; and
- roaming.

48.     Without this information, including the record of the event log at the time of alleged failure occurrence, a duplication of the operating state at the time of the alleged failure is impossible.

### 6.7     The Complaint

49.     In the second amended Class Action Complaint, the Plaintiff purports to bring the action "individually and on behalf of all others similarly situated."

50.     I do not find any similarity between Rothbaum and the vast majority of those who purchased Samsung i897 phones from AT&T. ███████████████████████ ███████████████████████████████████████████████████ In addition, Rothbaum's current situation is a result of her failure to exercise her option under the warranty to accept a replacement phone.  No other person has been identified who (a) has a phone that powered down in sleep mode and (b) rejected the opportunity to exchange that phone for a working replacement.

51.     The Complaint further asserts that STA only offered to exchange Plaintiff's defective Samsung Phone for another defective Samsung Phone.  This is blatantly incorrect.

Redacted for Public Docket

~~HIGHLY CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER~~
~~OUTSIDE ATTORNEYS' EYES ONLY~~

Plaintiff took her first phone to the AT&T store where she purchased it and that first phone was replaced by AT&T with a working Samsung phone of the same model. Plaintiff admits in her declaration that the replacement phone worked when she received it.[25] The alleged failure occurred after the replacement phone had provided several days of normal service.[26] In addition, Rothbaum continued to use the phone from March of 2011 until September of 2012.[27] This testimony contradicts the allegation in the Complaint (paragraph 65) that the phones "do not function in their ordinary capacity."

52.    Plaintiff has not apparently taken the replacement phone to AT&T and has not afforded STA an opportunity to have the second phone replaced. Indeed, although the Plaintiff was familiar with this procedure, she chose not to return the second phone, but instead took her Phone to counsel.[28]

### 6.8    The Thompson Tests

53.    In the Thompson Report, and further clarified in his deposition testimony, Thompson states that he received the Rothbaum Phone on October 25, 2013, and as clarified, by FedEx Ground from plaintiff's counsel.[29]   The Phone was received without a SIM card.[30]

---

[25] *See* Declaration of Amy Rothbaum, No. 11-CV-10509-MLW 3, ¶12-14. In her deposition, Rothbaum stated a slightly different account, this time testifying that the phone shut down either the day she received it or the next day. She testified, however, that she continued to use the phone.
[26] *See Id.*
[27] *See* Deposition of Amy Rothbaum, Nov. 20, 2013, NO. 11-CV-10509-MLW, 168:2-25.
[28] *See* Declaration of Amy Rothbaum, No. 11-CV-10509-MLW 3, ¶16.
[29] *See* Deposition of Ken Thompson, Nov. 22, 2013, NO. 11-CV-10509-MLW, 74:10-25.
[30] *See Id.* 75:1 – 78:1.

Redacted for Public Docket

HIGHLY CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER
OUTSIDE ATTORNEYS' EYES ONLY

54.     Thompson does not describe any attempt to determine the state of the Rothbaum Phone, other than its physical appearance, nor does he describe any attempt to replicate the state in which the Rothbaum Phone was operating when it was alleged to have failed.  This state cannot be replicated because it had not been documented and disclosed, and apparently not preserved.  Further, Thompson could not replicate the original state because of the absence of the original SIM card.

55.     Based on the Thompson testimony that the Rothbaum Phone was received and tested without a SIM card and could not send or receive a call, the Rothbaum Phone could not perform the operation for its primary intended purpose, placing and receiving calls.  Without the original SIM card, the Rothbaum Phone is not in the state in which the failure was alleged to have manifested itself, and even if known, that state cannot be accurately replicated without the original SIM card and without knowing the actual state of the Rothbaum Phone at the time of alleged failure.

56.     Thompson does not divulge the charge state of the battery when he received the Rothbaum Phone, but states that he charged the Rothbaum Phone at that time.[31]  Thompson states he recharged the Rothbaum Phone on October 25, 2013, indicating in his deposition that the charge level became low at that time.[32]

57.     The functional state of the Rothbaum Phone during the Thompson tests is not described.  Information is lacking as to which applications were installed, which applications

---

[31] *See Id,* 75:1 – 77:1.
[32] *See Id., 85:24* – 86:12.

Redacted for Public Docket

~~HIGHLY CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER~~
~~OUTSIDE ATTORNEYS' EYES ONLY~~

were active, including built-in and originally supplied applications such as Bluetooth and Wi-Fi or third party applications added by the Plaintiff, even if unknowingly downloaded in the background while the Rothbaum Phone was in the Plaintiff's possession.

58.     Thompson also fails to note the ambient conditions in which he tested the Rothbaum Phone.  For example, information on the signal strength and band of the Carrier's signal, strength of Wi-Fi signals, and strength of Bluetooth signals, are relevant to the electronic activity of a phone in sleep mode.  Lacking this information at the time of alleged failure further exacerbates the inability to properly test the Rothbaum Phone in an attempt to duplicate the alleged failure.

59.     Thompson discloses that he determined that the Rothbaum Phone had powered down by periodically tapping the power button, and observing the power up, or failure to power up, of the screen.[33]  He testified that, on the fifth day of test, the phone did not power up when the power button was tapped; however, when it was held down for a moment and released the screen powered on.[34]

60.     Although working appropriately when provided by AT&T to Rothbaum, the Rothbaum Phone is alleged to have developed a "Random Shut Down Defect" that manifests as a power down while in sleep mode with recovery only through removal of the battery.  This alleged problem signature is stated with respect to the Rothbaum Phone in both the demand letter and the "Second Amended Class Action Complaint."  The demand letter asserts:

---

[33] See Id., 81:14-18.
[34] See Id., 85:9-20.

Redacted for Public Docket

~~HIGHLY CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER~~
~~OUTSIDE ATTORNEYS' EYES ONLY~~

> Since at least July 2010, Samsung has been aware that the Samsung Phones have a design defect that causes the phones to randomly shut down ("Random Shut Down Defect"), which prevents the Samsung Phones from being used for their intended purpose. The Random Shut Down Defect causes the Samsung Phones to power off, completely, when the Samsung Phones are in the "standby" mode. In order to re-activate a Samsung Phone that has experienced the Random Shut Down Defect, a consumer must remove the battery from the phone, re-insert the battery and then press the power button to turn the Samsung Phone back on.[35]

The Complaint asserts:

> In particular, the Random Shut Down Defect causes the Samsung Phones to power off, completely, when the Samsung Phones are in the "Standby" mode. (Standby mode is when the phone is powered on but is in a low energy state because it is not in active use). In order to re-activate a Samsung Phone that has experienced the Random Shut Down Defect, a consumer must remove the battery from the phone, re-insert the battery, and then press the power button to turn the phone back on.[36]

61.     The demand letter and the Complaint allege that it is necessary to remove and re-insert the battery in order to re-activate the phone. This allegation is entirely different from the recovery observed by Rothbaum and by Thompson during his testing. In the Thompson test case, the Rothbaum Phone recovered normally when the power button was pressed for a moment and released.[37] It was not necessary to remove, then reinsert, the battery. It is clear that this is not the failure mode described in the Complaint.

---

[35] *See* Notification of Violation of M.G.L. c. 93A, 1, (Letter Dated May 17, 2011).
[36] *See* Second Amended Complaint 5:22.
[37] *See Id.*, 85:9-20.

Redacted for Public Docket

~~HIGHLY CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER~~
~~OUTSIDE ATTORNEYS' EYES ONLY~~

62.     The testing by Thompson totally lacks actual measurements, the recording and documentation of the conditions and observations (including initial conditions) during test. The testing by Thompson also totally lacks the most basic of scientific method hypotheses by which one initiates an investigation to determine the truth, or lack thereof, of the hypotheses. The Thompson test procedures have no factual basis, cannot be repeated, and lack credibility.

63.     It is clear that Thompson knows what a proper test should include. For example, in his testimony by deposition, Thompson criticized the test report of Matthew Chung for lacking specific testing methods and documentation even though Mr. Chung provided 23 pages of individual test records, including voltage and current observations. Thompson states:

> THE WITNESS: I'm uncertain how to interpret methodology. For example, if I would say, as part of the testing, "I'm going to do power tests," and someone else may say, "I'm going to do power tests," power tests, to me, may be different than what power tests means to them. Is that methodology? It's a power test.
>
> So, in this particular case, for example, he does a power test on page -- page 15, "Standby mode power consumption test." There is very little, if any, documentation that tells me how this was performed. What were the values? What was the deviation from normal, the results?
>
> There's no abnormal leakage. What's normal? There's no definition of normal. There's no values of normal.
>
> There's no indication of how it was performed. Was it performed with the battery in or not in? Was it performed with an external power supply or not with an external power supply? Was it a simple digital multimeter reading in voltage and amps? Was it a spectrum analyzer to do very, very fast sampling rates, to look at variations, jitter?
>
> So this document, and this test in particular, gives me very little information, other than saying a power consumption test was performed, nothing abnormal.

Redacted for Public Docket

~~HIGHLY CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER~~
~~OUTSIDE ATTORNEYS' EYES ONLY~~

It gives me no insight into what's taken place in the phone. It gives me no signature information, perhaps. It doesn't give me a thumbprint of what the power consumption is.

BY MR. BUCHANAN:

Q By "signature" or "thumbprint," I take it you mean some sort of a detail report of the power –

A Characteristics.

Q And I take it that's a kind of test that you do in your consulting business?

A I would think that anyone would do that type of test if they are looking for something that says dV/dt and is random in nature. There's many other things.

I think most professionals would have done different test methodologies, different test methodologies or protocols, than what was performed here.

Q Explain to me, what do you mean would have done different methodologies than was reported here.

A There is no one right way to do it. There's variations in the way to do it. And if you were to ask ten engineers to develop a methodology to do this, there would be differences.

Would they be substantial differences? Maybe. Would they be very identical? Perhaps. But, still, the information supplied in this report is, I found, of very low value.[38]

64.     Thompson fails to note that Chung was not asked to find the root cause of the defect, but instead was to provide extensive documentation of the Phone, his tests and observations.  Thompson did none of that.  Further, it is unusual that Thompson would criticize

---

[38] *See* Thompson deposition, Nov. 22, 2013, 115:4117:5.

Redacted for Public Docket

~~HIGHLY CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER~~
~~OUTSIDE ATTORNEYS' EYES ONLY~~

Chung's methodology for determining the root cause of a failure when Chung reported there were no failures.

65.



66.     However, Thompson does not report having made any voltage measurements, nor does he specify what voltage he believes to be insufficient.

---

[39] *See Id.* at 29:8-20.

Redacted for Public Docket

~~HIGHLY CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER~~
~~OUTSIDE ATTORNEYS' EYES ONLY~~

███████████████████████

███████████████

██████.

67.     Thus, Thompson opines low voltage as the cause of the failure but relies on information related to dV/dt for support of his erroneous opinion that all Samsung Phones experience the same problem and for the same reason.

68.     Even if Thompson's tests were credible, and they are not, they fail to provide any information on the occurrence or the cause of the alleged failure, or any bases for testing of other phones to determine a common cause of failure.   Thompson, pursuant to instructions by Rothbaum's counsel, makes no attempt to determine by testing the cause of the alleged failure; and it has not been determined that the phone is defective.

> Once again, I was not asked to determine root cause of the third random shut down defect it was the prevalence of random shut down defect. Not root cause but the cause of.[40]

### 6.9     The Thompson Opinions

69.     In addition to the cursory description of Thompson's observations on the Rothbaum Phone, while powered on without a SIM card, the Thompson Report references and characterizes STA produced documents.   Thompson asserted that these documents provide a bases for saying that all Samsung Captivate i897 Phones sold in the United States were manufactured with a Random Shutdown Defect.[41]

---

[40] *See Id.* at 117:6-9.
[41] *See Id.* at 30:19 31:19, 69:1 74:9.

Redacted for Public Docket

~~HIGHLY CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER~~
~~OUTSIDE ATTORNEYS' EYES ONLY~~

70.     I do not agree.  The documents referenced relate to a category of returns called "POWER ON/OFF CTI" or a "customer trouble indicator" (CTI) of Power On/Off.[42]  Several documents that Thompson states he reviewed, but chose not to consider, show that this customer return category includes multiple different failure modes.



**Table 2[43]**

---

[42] *See* STA_ROTH 0000195; *see also* STA_ROTH 0000004, '134, '174, '186, '304, '420, '472, '473, '551, '554.
[43] *See* STA_ROTH 0000554.

Redacted for Public Docket

~~HIGHLY CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER~~
~~OUTSIDE ATTORNEYS' EYES ONLY~~

71. ███████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████

72. ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████

73. ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████

74. ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

Redacted for Public Docket

~~HIGHLY CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER~~
~~OUTSIDE ATTORNEYS' EYES ONLY~~

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████[44]

75.     Thompson makes no attempt to determine the cause of the alleged failures within the category.  Even though he reviewed all the documents and cited STA_ROTH 0000547-598 at STA_ROTH 0000551, he did not consider STA_ROTH 0000554 which shows, in Table 2 as shown above, a break out analysis of this category including six different causes of failure.

### 6.10    The Chung Tests

76.     Matthew Chung tested the Rothbaum phone over a period of three days.  He tested the phone with a SIM card and confirmed that the phone was functional for its intended use.  His report[45] includes 23 pages of test documentation including the type and description of each test, the time of each test and the results or observations.

77.     During this time he observed that the Rothbaum phone, operating with a SIM card, did not fail.

### 6.11    Proposed Tests to Determine Cause of Alleged Failure, if any

78.     If asked to determine a cause of failure for the Rothbaum Phone, I would prepare a plan for tests requiring an extended period of time.  I would not, however, be able to fully

---

[44] *See* Thompson deposition, Nov. 22, 201330:19  31:19, 69:1, 74:9.
[45] *See* Senior Engineer's Report on the Testing of Amy Rothbaum's smart phone, No. 11-CV-10509-MLW.

Redacted for Public Docket

~~HIGHLY CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER~~
~~OUTSIDE ATTORNEYS' EYES ONLY~~

duplicate the state of the Rothbaum Phone when it was alleged to have failed, since that state is not documented.

## 7   FINDINGS AND SUMMARY OF OPINIONS

79.   It is my opinion that:

1)   the failure alleged to be observed by Thompson in his test was not the same as the failure alleged in the Complaint;

2)   Plaintiff has made no attempt to determine the cause of the alleged failure of the Phone received by Amy Rothbaum as an exchange replacement from AT&T on or about March 1, 2011 in Holyoke, Massachusetts; and it has not been determined that the phone is defective;

3)   Plaintiff has not established that there is one and only one cause for the Power On/Off Category of returns of a Samsung Captivate i897 phone.

4)   in my opinion, there are multiple (at least 5) causes for the Power On/Off Category of returns of a Samsung Captivate i897 phone;

5)   Plaintiff has not established the cause of the alleged Power On/Off in sleep mode of Amy Rothbaum's Phone purchased from AT&T on October 16, 2010 in Holyoke, Massachusetts;

6)   in my opinion, the cause of the alleged Power On/Off in sleep mode of Amy Rothbaum's Phone received as an exchange replacement from AT&T on or about March 1, 2011 in Holyoke, Massachusetts is not known, and since the state of the Phone was not documented, the state cannot be determined;

7)   in my opinion, the cause of the alleged Power On/Off in sleep mode of Amy Rothbaum's Original Phone purchased from AT&T on October 16, 2010 in Holyoke, Massachusetts is not known; and since the state of the Phone was not documented, cannot be determined;

8)   it is not known if the alleged Power On/Off in sleep mode of either of the above phones is the Instability of PMIC VBAT Voltage reported by Samsung in a small percentage of the i897 Phones.;

9)   no other person has been identified who has experienced Power On/Off in sleep mode of a Samsung Captivate i897 phone received in

Redacted for Public Docket

HIGHLY CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER
OUTSIDE ATTORNEYS' EYES ONLY

exchange replacement of a Samsung Captivate i897 phone that exhibited Power On/Off in sleep mode;

10) it has not been determined that the cause of a Power On/Off in sleep mode of any other identified user's original Samsung Captivate i897 phone or replacement Samsung Captivate i897 phone is the same as the cause of the Power On/Off in sleep mode of either of Amy Rothbaum's Phones received from AT&T; and

11) a small percentage of the i897 phones have experienced a power shutdown problem in sleep mode. Thompson asserts that 100% of the i897 phones are defective, but his assertion is flatly erroneous.

Redacted for Public Docket

~~HIGHLY CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER~~
~~OUTSIDE ATTORNEYS' EYES ONLY~~

## 8   EXHIBITS TO BE USED AS SUMMARY OF OR SUPPORT FOR OPINIONS

80.   The following exhibits may be used as a summary of or support for my opinions:

1) Charts illustrating Plaintiff and Plaintiff Expert(s) deposition statements;

2) Charts illustrating Positions taken by Plaintiff;

3) Charts, diagrams or animations illustrating the subject matter of the suit;

4) Charts, diagrams or animations illustrating the configuration of systems/products as they are used in typical applications;

5) Charts, diagrams or animations illustrating the operation of systems/products as they are used in typical applications;

6) Charts, diagrams, schematics, photographs, or animations illustrating the structure / design and operation of testing procedures, equipment, setup conditions, and results;

7) Various enlargements of materials produced and/or created during discovery;

8) All references in this expert report, in any other report(s) or declarations(s) I provide in this lawsuit, and in the expert reports and declarations submitted by the Plaintiff or Plaintiff's Expert(s); and

9) Charts, diagrams or animations associated with a tutorial.

Redacted for Public Docket

HIGHLY CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER
OUTSIDE ATTORNEYS' EYES ONLY

## 9    CONCLUDING REMARKS

81.    I understand that this case may require additional discovery and review of discovery material.  I have also only recently received deposition transcripts for the Plaintiff and Plaintiff's expert Mr. Thompson and may, upon further review, identify other aspects related to this case that may suggest filing a supplemental report.  If amendments or supplements to this report are necessary, I will provide those in a timely manner.

Dated:  December 2, 2013

_Joseph C. McAlexander III_

Joseph C. McAlexander III

**ATTACHMENTS:**

| | |
|---|---|
| **Attachment A** | **Curriculum Vitae and Other Cases** |
| **Attachment B** | **Consumer Reports, Volume 76, No. 1 (January 2011) at 33** |

Redacted for Public Docket

# ATTACHMENT A

Redacted for Public Docket

**CURRICULUM VITAE**          Joseph C. McAlexander [III]

## PROFESSIONAL SUMMARY

Currently a Registered Professional Engineer (#79454) and recognized as an inventor on 31 US and a number of foreign patents, I am President of McAlexander Sound, Inc., and the Managing Director of McAlexander Sound Pte Ltd. I have focused my expertise to support a number of clients in product, process, and operations analysis and investigation. Thirty-nine years of experience in microcircuit and semiconductor technologies has developed my skills in areas of circuit design and analysis, device fabrication and assembly, testing, marketing, control system design and analysis, manufacturing operations and respective areas of quality, reliability, and defect / failure analysis. I am, among others, a Manager with QM Partners, LP, supporting clients in IP management, and the President and CEO of MDFHoldings, Inc., an IP holding company currently engaged in the field of GPS Tracking. I have:

- designed Dynamic Random Access Memories (DRAMs), Static Random Access Memories (SRAMs), Charge Coupled Devices (CCDs), Shift Registers (SRs), and functional circuits including I/O buffers for address and data, decoders, clocks, sense amplifiers, fault tolerant, parallel-to-serial data paths for video applications, level shifters, converters, pumps, and logic, as well as wireless communication systems and MEMs applications;

- managed operations including engineering, training, and quality assurance for device fabrication, assembly, test, analysis, and reliability assessment, as well as manufacturing control (testing, analysis, and control involved use of mechanical calibration and measuring equipment, including optical, scanning e-beam, IR, capacitive, and laser using phase contrast and FFT for HARI applications); managed software program development departments for assembly manufacturing, process control, and testing;

- taught courses in solid state device physics, integrated circuit design, integrated circuit fabrication, and statistical control;

- provided expert services, investigating both process and design technologies of various devices (microprocessor and controller, memory, programmable logic, card, tag, module, mixed signal, custom, and other), systems (PC and peripheral, computer, control, laser measurement, switch, architecture, software, and other), and consumer products (medical, TV, telephone, VCR, facsimile, copier, lighting, game, and other); and

- provided nuclear radiation hardness testing services for military and space clients.

From 1986-1990, I was Executive Vice President of EPI Technologies, Inc., prior to joining the staff at Cochran Consulting, Inc. where I served as senior managing consultant from 1991-2002. From 1972 to 1986, I was employed by Texas Instruments Incorporated - two years as the Quality and Reliability Manager for the 256K DRAM wafer fabrication facility, three years as the Engineering/QRA Manager for the TI Singapore test and assembly operation, and nine years in semiconductor design and product engineering management functions.

Redacted for Public Docket

CURRICULUM  VITAE                                          Joseph C. McAlexander [III]

## EXPERIENCE   PROFILE

2006-present       **QM Partners, L.P.** – Texas
                   **Manager**

                        o Management of development, licensing, prosecution and
                        exploitation of intellectual property.


2006-present       **Guardian Technologies, LLC** – Texas
                   **Manager**

                        o IP holding and licensing company.


2006-present       **Appropriate Holdings, LLC** – Delaware
                   **Manager**

                        o IP holding company.


2005-present       **McAlexander Sound Pte Ltd** - Singapore
                   **Managing Director**

                        o System, Product, and Process investigation, expert witness
                        services for protection of intellectual property;

                        o Patent portfolio development and valuation;

                        o Contract consultation.


2002-present       **MDFHoldings, Inc.** – Las Vegas, NV
                   **CEO**

                        o IP holding and licensing company.


1996-2010          **RMC Management, LLP** - Plano, TX
                   **Partner**

                        o Asset management.

Redacted for Public Docket

**CURRICULUM VITAE**                                       Joseph C. McAlexander [III]

**EXPERIENCE  PROFILE** (continued)

1988-present        **McAlexander Sound, Inc. (McASI)** - Plano, TX
                    **President**

         o System, Product, and Process investigation, expert witness services for protection of intellectual property;

         o Patent portfolio development and valuation;

         o Product liability and insurance claim investigation, expert witness services for matters involving such claims;

         o Quality Systems consulting and engineering;

         o Radiation Hardness Testing Technical Representative;

         o Technical Advisor in High Aspect Ratio and Surface Contour Measurement using Direct-to-Digital Holography.

1991-2002           **Cochran Consulting, Inc. (CCI)** - Richardson, TX
                    **Managing Consultant**

         o System, Product, and Process investigation, expert witness services for protection of intellectual property;

         o Design, process, and product reliability;

         o Defect and failure analysis.

1986-Nov'90         **EPI Technologies, Inc.** - Richardson, TX
                    **Executive Vice President and Company Officer**

         o Managed Advanced Technology Div., QA, and Engineering, including software program development;

         o Developed strategic, space/energy market growth plans;

         o Negotiated the acquisition of a radiation company;

Redacted for Public Docket

**CURRICULUM VITAE**                                          Joseph C. McAlexander III

**EXPERIENCE PROFILE** (continued)

        o Designed and managed physical analysis, radiation effects, and environmental stress laboratories, including optical and e-beam measurement;

        o Achieved > 30% annual revenue growth and profitability for each laboratory the first 12 months;

        o Product and Process investigation services for protection of intellectual property.

1972 – 1986        **Texas Instruments, Inc. -** Dallas/Houston, TX; Singapore

    '84 - '86    **Quality/Reliability Assurance Manager,** **TI Dallas** Advanced DRAM semiconductor wafer fabrication facility

        o Developed/implemented on-line, computerized SPC software tools for dimensioning analysis and control and pattern recognition;

        o Coordinated people development, design-of-experiments;

        o Managed chemical and physical analysis laboratories;

        o Implemented control systems to assure product, process, material, equipment, and facility compliance, including Cost of Quality analysis.

    '82 - '84    **Quality/Reliability Assurance and Engineering Manager,** **TI Singapore** assembly/test facility

        o Developed, implemented, and operated an effective Quality/Reliability Assurance program for assembly processing including optical pattern recognition for equipment registration;

        o Supervised 225 people for 7 day/week operation, including QRA, Computer Systems software development, and Training;

        o Trained engineers in Solid State Physics, device fabrication, and statistical process control.

Redacted for Public Docket

**CURRICULUM VITAE**                                    Joseph C. McAlexander III

**EXPERIENCE  PROFILE** (continued)

'81 - '82    <u>**Engineering Operations Manager**</u>, **TI Houston**

o Managed DRAM memory product cost center;

o Responsible for division test software generation, product assembly and test quality / yield, cost reduction and quality improvement;

o Provided technical customer interface for marketing;

o Coordinated TI Singapore engineering test/assembly.

'79 - '81    <u>**Product Engineering Manager**</u>, **TI Houston**

o Responsible for yield improvement, technical customer interface, quality improvement, design evaluation, and device characterization for DRAM and CCD products;

o Developed device specifications and test software.

'72 - '79    <u>**Design Section Manager / Engineer**</u>, **TI Houston**

o Responsible for design and development, process compatibility, production introduction of Dynamic Ram products;

o Activities included electrical and physical layout, SPICE model simulation, test program generation, and product implementation for MOS Dynamic Ram products.

1969 - 1972    **U. S. Army** - Coventry, Rhode Island; Seoul, Korea
<u>**Captain, Air Defense Artillery**</u>

o Served one year as Communications Officer in Korea;

o Served two years as Tactical Officer, New England Defense.

Redacted for Public Docket

CURRICULUM VITAE                                          Joseph C. McAlexander [III]

ORGANIZATIONS, PUBLICATIONS, EDUCATION

**PROFESSIONAL ORGANIZATIONS AND AWARDS**

1 - Institute of Electrical and Electronics Engineers, Inc. (IEEE), Senior Member.  Societies: Computer, Electron Devices, Solid State Circuits

2 – Licensing Executives Society (LES)

3 – National Society of Professional Engineers

4 – Texas Board of Professional Engineers, Registered License #79454

5 – Society of Flight Test Engineers

5 - 2000/2001 Nationwide Register's Who's Who in Executives and Businesses

6 - 1996/1997 Strathmore's Who's Who Registry of Business Leaders

**PUBLICATIONS**

1- NUS Proceedings of Engineering Convention '83, Aug '83, pgs. 139-142, The Memory Challenge.

2- Archives of Biochemistry and Biophysics, Dec'81, Vol. 212, No. 2, Equilibrium Constants under Physiological Conditions for the Reactions of D-3-Phosphoglycerate Dehydrogenase and L-Phosphoserine Aminotransferase.

3- International Electron Devices Meeting, Dec '79, pgs. 355-357, Sub 100ns 16K x 1 MOS Dynamic RAM Using a Grounded Substrate.

**EDUCATION   PROFILE**

| | |
|---|---|
| 1980 - 1985 | Taught Solid State Device Physics, Semiconductor Processing, and Circuit Design Techniques |
| | Taught Statistical Quality Control methods |
| | Effectiveness Training and Japanese Manufacturing Techniques, Participative Problem Solving courses |
| 1975 - 1976 | 1.5 years Graduate study in Neural Science, the University of Texas Graduate School of Biomedical Science |
| 1965 - 1969 | BSEE, North Carolina State University |

11-CV-10509-MLW, McAlexander Expert Report and Declaration 12/2/2013, Attachment A          6

Redacted for Public Docket

**CURRICULUM VITAE**                                    Joseph C. McAlexander III

<u>**PATENTS (US-31 Foreign-8)**</u>

| | |
|---|---|
| 4,239,993 | (1980) High Performance Dynamic Sense Amplifier with Active Loads |
| 4,280,070 | (1981) Balanced Input Buffer Circuit for Semiconductor Memory |
| 4,288,706 | (1981) Noise Immunity in Input Buffer Circuit for Semiconductor Memory |
| 4,370,575 | (1983) High Performance Dynamic Sense Amplifier with Active Loads |
| 4,418,293 | (1983) High Performance Dynamic Sense Amplifier with Multiple Column Outputs |
| 4,533,843 | (1985) High Performance Dynamic Sense Amplifier with Voltage Boost for Row Address Lines |
| 4,543,500 | (1985) High Performance Dynamic Sense Amplifier Voltage Boost for Row Address Lines |
| 4,543,501 | (1985) High Performance Dynamic Sense Amplifier with Dual Channel Grounding Transistor |
| 4,748,349 | (1988) High Performance Dynamic Sense Amplifier with Voltage Boost for Row Address Lines |
| 6,172,640 B1 | (2001) Pet Locator |
| 6,236,358 B1 | (2001) Mobile Object Locator |
| 6,421,001 B1 | (2002) Object Locator |
| 6,441,778 B1 | (2002) Pet Locator |
| 6,480,147 B2 | (2002) Portable Position Determining Device |
| 6,518,919 B1 | (2003) Mobile Object Locator |
| 6,771,213 B2 | (2004) Object Locator |
| 6,859,171 B2 | (2005) Mobile Object Locator |

Redacted for Public Docket

**CURRICULUM VITAE**                                      Joseph C. McAlexander III

**PATENTS** (continued)

| | |
|---|---|
| 7,113,126 B2 | (2006) Portable Positioning Determining Device |
| 7,179,674 B2 | (2007) Bi-Directional Released-Beam Sensor |
| 7,209,075 B2 | (2007) Mobile Object Locator |
| 7,324,044 B2 | (2008) Object Locator |
| 7,336,227 B2 | (2008) Portable Position Determining Device |
| 7,340,260 B2 | (2008) System and Method for Tracking the Location of Multiple Mobile Radio Transceiver Units |
| 7,353,706 B2 | (2008) Weighted Released-Beam Sensor |
| 7,397,097 B2 | (2008) Integrated Released Beam Layer Structure Fabricated in Trenches and Manufacturing Method Thereof |
| 7,564,405 B2 | (2009) Object Locator |
| 7,657,265 B2 | (2010) System and Method for Tracking the Location of Multiple Mobile Radio Transceiver Units |
| 7,760,137 B2 | (2010) Portable Positioning Determining Device |
| 7,764,228 B2 | (2010) Portable Positioning Determining Device |
| 7,989,906 B2 | (2011) Bi-Directional released-Beam Sensor |
| 8,334,775 B2 | (2012) RFID-Based Asset Security and Tracking System, Apparatus and Method |
| JP 55-053640 B4 | (1980) Defect Resistant Semiconductor Memory Cell |
| JP 59-044720 B4 | (1984) Semiconductor High Speed Read/Write Memory Unit |
| DE2935121 C2 | (1980) Clock Voltage Generator for Semiconductor Memory with Reduced Power Dissipation |
| DE3043651 A1 | (1981) Clock Voltage Generator for Semiconductor Memory with Reduced Power Dissipation |

Redacted for Public Docket

**CURRICULUM VITAE**                                      Joseph C. McAlexander III

**PATENTS** (continued)

GB2032211 B2          (1980) High Performance Dynamic MOS Read/Write Memory

EP 1 557 058 B1       (2011) System and method for tracking the location of multiple
                      mobile radio transceiver units
                      [States: AT BE BG CH CY CZ DE DK EE ES FI FR GB GR HU
                      IE IT LI LU MC NL PT RO SE SI SK TR]

EP 1 676 809 B1       (2010) Weighted released-beam sensor
                      [States:  DE FR GB IT]

EP 1 676 810 B1       (2010) Bi-directional released-beam sensor
                      [States:  DE FR GB IT]

Redacted for Public Docket

**CURRICULUM VITAE**                                    Joseph C. M$^c$Alexander [III]

## CASES

Cases over at least the past 5 years, either active or closed, in which I have signed a Protective Order, have testified as an expert either at a trial, hearing, or deposition, or have submitted statements / opinions, are:

| CASE | CASE NUMBER | LOCATION | YEAR | TYPE[2] |
|---|---|---|---|---|
| Micron* v. Rambus (*firm: Weil Gotshal ..) | 00-792-RRM | Wilmington, DE | 2000-2009 | P,t |
| (Patents related to RDRAM, synchronous clocks applied against SDRAMs) | | | | |
| Dusan* v. Travelers Ins (*firm: Parsons) | CV-S-01-0963 | Las Vegas, NV | 2003 - 2007 | C, t |
| (Insurance liability for damaged shipment) | | | | |
| Sandisk v. Infineon* (*firm: Bartlit Beck...) | C-03-02931 MJJ | ND, CA | 2004 - 2007 | P |
| (Patents related to IC design and architecture) | | | | |
| Lexar* v. Pretec et al (*firm: Weil Gotshal) | C 00-4770 MJJ | Santa Clara, CA | 2004 – 2007 | P |
| (Patents related to semiconductor memory system protocol and architecture) | | | | |
| Mitutoyo* v. Central Purchasing (*firm: Oliff & Berridge) | 03-C-0990 | Chicago, IL | 2004 - 2008 | P,t |
| (Patents related to electronic calipers) | | | | |
| Rambus v. Samsung* (*firm:Weil Gotshal) | C 05-02298 WDB C 05-02398 RMW | San Jose, CA | 2005 - 2009 | P |
| (Patents related to RDRAM, synchronous clocks applied against SDRAMs) | | | | |
| Rambus v. Samsung* (*firm: Weil Gotshal) | C 05 00334 EDL C 05 00334 RMW | San Francisco, CA | 2005 - 2009 | P |
| (Patents related to RDRAM, synchronous clocks applied against SDRAMs) | | | | |

---

[1] * = Client

[2] P = Patent;  C = Contract;  TS = Trade Secret;  AT = Antitrust;  CA = Class Action; t = testified

Redacted for Public Docket

**CURRICULUM VITAE**                                    Joseph C. McAlexander III

**Cases** (continued)

| CASE | CASE NUMBER | LOCATION | YEAR | TYPE[1] |
|---|---|---|---|---|
| Rambus v. Micron* (*firm: Weil Gotshal) | C 06-00244 RMW | San Jose, CA | 2006 - 2009 | P,t |
| (Patents related to RDRAM, synchronous clocks applied against SDRAMs) | | | | |
| Samsung* v. Rambus (*firm: Weil Gotshal) | 1454-N | DE Chancery Court | 2005 - 2007 | C |
| (Patents related to RDRAM, synchronous clocks applied against SDRAMs) | | | | |
| Samsung* v. Rambus (*firm: Weil Gotshal) | 3:05cv406 | Richmond, VA | 2005 - 2007 | P |
| (Patents related to RDRAM, synchronous clocks applied against SDRAMs) | | | | |
| Toshiba v. Hynix* (*firm: Townsend and Townsend And Crew | 304-CV-2391L 304-CV-2392B | Dallas, TX | 2005 - 2007 | P |
| (Patents related to semiconductor memory devices) | | | | |
| FormFactor v. Phicom* (*firm: Mitchell Silberberg) | 05-6062-HO | Oregon | 2005 - 2009 | P |
| (Patents related to probe cards) | | | | |
| Lexar* v. Fuji (*firm:Weil Gotshal) | 03-00355 MJJ | Santa Clara, CA | 2006 - 2007 | P |
| (Patents related to semiconductor memory system protocol and architecture) | | | | |
| Cobra v. BCNY* (*firm: Hogan & Hartson) MARRA | 05-61225-CIV | Ft Lauderdale, FL | 2006 - | P,t |
| (Patents related to electronic flashing) | | | | |
| VAC v. T-Netix* (*firm: Bell Nunnally) | 03-11399-B | Dallas, TX | 2006 - 2008 | C,t |
| (Patents related to communication control systems) | | | | |
| Actel v. BTR* (*firm: McDermott Will & Emery) | 1100046359 | JAMS Arbitration | 2006 - 2007 | C |
| (Patents related to IC architecture) | | | | |

Redacted for Public Docket

**CURRICULUM VITAE**                                   Joseph C. McAlexander [III]

**Cases** (continued)

| CASE | CASE NUMBER | LOCATION | YEAR | TYPE[1] |
|------|-------------|----------|------|---------|
| Omega* v. Fortin et al (*firm: Allen Dyer) | 6:05-CV-1113-ORL-22-DAB | Orlando, FL | 2006 - 2007 | P,t |
| (Patents related to remote start and security systems) | | | | |
| Mosaid v. Micron* (*firm: Kirkland & Ellis) | 2:06-CV-302-DF | ED, TX | 2006 - 2009 | P, t |
| (Patents related to memory devices) | | | | |
| Mosaid v. PowerChip* (*firm: Trop) | 2:06-CV-302-DF | ED, TX | 2006 - 2008 | P,t |
| (Patents related to memory devices) | | | | |
| Mosaid v. Promos* (*firm: Akin Gump) | 2:06-CV-302-DF | ED, TX | 2006 - 2008 | P,t |
| (Patents related to memory devices) | | | | |
| Promos* v. Mosaid (*firm: Akin Gump) | C 06-05788 CS | ND, CA | 2006 - 2008 | P |
| (Patents related to memory devices) | | | | |
| T-Netix* v. VAC (*firm: Bell Nunnally) | 3:05-CV-0654-D | ND, TX | 2006 - 2008 | P |
| (Patents related to communication control systems) | | | | |
| TIP v. T-Netix* (*firm: Bell Nunnally) | H-04-3718 | SD, TX | 2006 – 2007 | P |
| (Patents related to telephone control systems) | | | | |
| T-Netix* v. Global et al (*firm: Gruber Hurst) | 2-06cv-426-TJW | ND, TX | 2006 - 2008 | P |
| (Patents related to communication control systems) | | | | |
| NIKE* v. adidas (*firm: McDermott Will & Emery) | 9:06-CV-43 | ED, TX | 2006 - 2007 | P,t |
| (Patents related to measurement of movement) | | | | |

Redacted for Public Docket

**CURRICULUM  VITAE**                                    Joseph C. McAlexander [III]

**Cases** (continued)

| CASE | CASE NUMBER | LOCATION | YEAR | TYPE[1] |
|------|-------------|----------|------|------|
| PhatRat v. NIKE* (*firm: Banner & Witcoff) | 1220035678 | JAMS Arbitration | 2007 | P |
| (Patents related to measurement of movement) | | | | |
| Comverse* v. ATI (*firm: Dickstein Shapiro) | 50 494 T 00319 06 | JAMS Arbitration | 2007 - 2008 | C |
| (Messaging control systems) | | | | |
| ProBatter* v. Joyner (*firm:  Hiscock &Barclay) | 6:05-cv-02045 | ND Iowa, Eastern Div | 2007 | P |
| (Patents related to Baseball Video Sync) | | | | |
| TIP v. SBC* (*firm:  Bell Nunnally) | 4:06-cv-00253 | Houston, TX | 2007 - 2008 | P |
| (Patents related to telephone control systems) | | | | |
| Avocent* v. Rose et (*firm:  Davidson Berquist) | C06-1711-MJP | Seattle, WA | 2007 | P, t |
| (Patents related to video and data transmission, KVM control and OSD) | | | | |
| Samsung* v. Matsushita (*firm:  Kirkland & Ellis) | 6:06-CV-154 (LED) | Tyler, TX | 2007 - 2008 | P |
| (Patents related to IC process and design) | | | | |
| Fenner* v. Microsoft et al (*firm:  Fulbright & Jaworski) | 6:07-CV-08 (LED) | Tyler, TX | 2007 - 2009 | P, t |
| (Patent related to joystick interface to low voltage port) | | | | |
| Freescale v. ProMOS* (*firm: Hogan & Hartson) | 4:06-CV-491 (RAS) | Sherman, TX | 2007 - 2008 | P |
| (Patents related to memory access and bus termination) | | | | |
| Renesas v. Samsung* (*firm:  Fish & Richardson) | 07-54 (JJF) | DE | 2007- 2008 | P |
| (Patent related to bus termination) | | | | |

Redacted for Public Docket

**CURRICULUM VITAE**                                          Joseph C. McAlexander III

**Cases** (continued)

| CASE | CASE NUMBER | LOCATION | YEAR | TYPE[1] |
|------|-------------|----------|------|---------|
| Renesas v. Samsung* (*firm: Fish & Richardson) | 337-TA-595 | ITC | 2007 | P |
| (Patent related to bus termination) | | | | |
| Symbol v. MetroLogic* (*firm: McDermott Will & Emery) | 2:05-CV-509 (LED) | ED, TX | 2007-2008 | P |
| (Patents related to bar code) | | | | |
| Agere v. Samsung* (*firm: Quinn Emanuel) | 2-06-CV-185 (TJW-CE) | ED, TX | 2007 - 2010 | P |
| (Patent License Dispute) | | | | |
| Trontech* v. VTech (*firm: Wong Cabello | 6:06-CV-451-LED | ED, TX (Tyler) | 2008 | P |
| (Patents related to telephones) | | | | |
| DESA* v. EML (*firm: Fitch Even) | 8-04-0160 | MD TN, Nashville | 2008 - 2009 | P |
| (Patent related to lighting) | | | | |
| Gemini v. LANDesk* (*firm: Davidson Berquist) | 4:07-CV-00521 | ND TX, Sherman | 2008 | P |
| (Patent related to Networks) | | | | |
| DCS* v. McData (*firm: Haynes Boone) | 3:06-CV-812-L | ND TX, Dallas | 2008 - 2009 | C, t |
| (Breach of Contract) | | | | |
| Bennett Marine v. Lenco* (*firm: Malen Haley) | 04-cv-60326-KAM | SD FL, Ft Laud. | 2008-2009 | P, t |
| (Patent related to Automated Boat Trim Retraction) | | | | |
| Samsung* v. ON Semi (*firm: Kirkland & Ellis) | 07-CV-449 (JJF) | DE | 2008-2009 | P |
| (Patents related to circuits and process) | | | | |

Redacted for Public Docket

CURRICULUM VITAE                                        Joseph C. M<u>c</u>Alexander III

Cases (continued)

| CASE | CASE NUMBER | LOCATION | YEAR | TYPE[1] |
|------|-------------|----------|------|---------|
| FormFactor v. Phicom* (*firm:Finnegan, Henderson, F G & D) | 337-TA-621 | ITC | 2008 - 2009 | P, t |
| (Patents related to probe cards) | | | | |
| Orica* v. Austin Powder (*firm: McDermott Will | CV-07-3337-AHM | CD CA, | 2008 - 2010 | P |
| (Patents related to blasting electronic controls) | | | | |
| AMS* v. Crane & Seaga (*firm:  Davidson  Berquist | 3:03-CV88-JPB, 3:08-CV-97-JPB and 3:04-CV-80,75,48 | ND WVA | 2008- 2012 | P, t |
| (Patents related to vending machines) | | | | |
| Myriad v. Alltech, Inc.* (*firm: Duane Morris) | 1:08-CV-00253-SS | WD TX, Austin | 2008 - 2010 | TS, t |
| (Trade Secret & © related to software) | | | | |
| SciCo* v. Boston Scientific (*firm: Jeffer Mangel) | 9:07-CV-00076-RHC | ED TX, Lufkin | 2008 - 2009 | P, t |
| (Patent related to catheters) | | | | |
| Renishaw* v. TESA (*firm: Oliff & Berridge) | 1:2008-cv-03485 | ND IL, Eastern Div | 2008 - 2009 | P |
| (Patents related to manufacturing probes) | | | | |
| Rambus v. Micron* (*firm: Quinn Emanuel) | 04-431105 | SCCA, San Fran | 2008 - 2011 | AT, t |
| (Antitrust claims) | | | | |
| Harris* v. FedEx (*firm: Allen Dyer) | 6:07-CV-1819-Orl-28KRS | MD FL, Orlando | 2008 - 2010 | P, t |
| (Patents related to ground based wireless communication) | | | | |
| Omega* v. Lear (*firm:  Allen Dyer) | 6:07-CV-1422-Orl-31DAB | MD FL, Orlando | 2008- 2011 | P, t |
| (Patents related to vehicle alert and remote start) | | | | |

Redacted for Public Docket

**CURRICULUM VITAE**                                      Joseph C. McAlexander [III]

**Cases** (continued)

| CASE | CASE NUMBER | LOCATION | YEAR | TYPE[1] |
|------|-------------|----------|------|---------|
| Arbitron* v. Int'l Demographics (*firm:Dickstein Shapiro) | 2;06-cv-434(TJW) | ED TX, Marshall | 2008 - 2009 | P |
| (Patents related to measuring program audiences) | | | | |
| LSI-Agere v. NSC* (*firm: Weil Gotshal) | 337-TA-648 | ITC | 2008- 2009 | P |
| (Patents related to IC process and structure) | | | | |
| Affinity Labs* v. BMW (*firm: Duane Morris) | 9:08-CV-00164 | ED TX, Lufkin | 2008 - 2010 | P,t |
| (Patents related to portable audio player) | | | | |
| Affinity Labs* v. Dice (*firm: Duane Morris) | 9:08-CV-00163 | ED TX, Lufkin | 2008 - 2010 | P |
| (Patents related to portable audio player) | | | | |
| Affinity Labs* v. Alpine (*firm: Duane Morris) | 9:08-CV-00171 | ED TX, Lufkin | 2008 - 2010 | P, t |
| (Patents related to portable audio player) | | | | |
| Affinity Labs* v. Apple (*firm: Duane Morris) | 9:09-CV-00047 | ED TX, Lufkin ND CA, Oakland | 2008 – 2009 2010 - 2011 | P,t |
| (Patents related to portable audio player) | | | | |
| Fast Memory Erase v. Spansion* (*firm: Morrison Foerster) | 3:08-CV-0977-M | ND TX, Dallas | 2008 - 2011 | P |
| (Patents related to memory source erase) | | | | |
| Rambus v. nVidia* et al. (*firm: Fish & Richardson) | 337-TA-2637 | ITC | 2008 - 2011 | P |
| (Patents related to memory controllers) | | | | |
| ITT* v. Celco et al. (*firm: Davidson Berquist) | 09-190-JJF | DE | 2009 - 2012 | P |
| (Patent related to GPS position determination) | | | | |

Redacted for Public Docket

**CURRICULUM VITAE**                                     Joseph C. McAlexander III

**Cases** (continued)

| CASE | CASE NUMBER | LOCATION | YEAR | TYPE[1] |
|------|-------------|----------|------|---------|
| Hitachi v. LGE* (*firm: Fish & Richardson) | 2:07-CV-155-CE | ED TX, Marshall | 2009 | P |
| (Patents related to plasma displays) | | | | |
| e-Digital v. Samsung* (*firm : Kirkland & Ellis) | 2:08-cv-93 | ED TX, Marshall | 2009 | P |
| (Patents related to handheld recording device) | | | | |
| TQP v. ING* (*firm: Duane Morris) | 2:08-cv-00471-TJW-CE | ED TX, Marshall | 2009 - 2011 | P |
| (Patents related to encrypted data transmission) | | | | |
| TAOS* v. Intersil (*firm: Munck Carter) | 4:08-CV-451 | ED TX, Sherman | 2009 - | P |
| (Patent related to optical detector) | | | | |
| Avocent* v. The United States (Rose) (*firm: Davidson Berquist | 08-69C | US Court of Federal Claims | 2009 - 2011 | P, t |
| (Patents related to video and data transmission, KVM control and OSD) | | | | |
| GSM v. Non Typical* (*firm: Fee Smith Sharp & Vitullo) | 6:07-CV-0177 LED | ED TX, Tyler | 2009 - 2010 | P,t |
| (False Advertising and Patents related to sports surveillance cameras) | | | | |
| Arbitron* v. Kiefl (*firm: Dickson Shapiro) | 1:09-CV-04013-PAC  SD | NY, New York | 2009 - 2010 | P |
| (Patents related portable people meters) | | | | |
| Guardian* v. RadioShack (*firm: Munck Carter) | 3:2009-cv-00649 | ND TX, Dallas | 2009 - 2011 | P |
| (Patent related to security and surveillance) | | | | |
| Commil* v. Cisco/Aruba (*firm: Sayles Werbner) | 3:07-CV-341 | ED TX, Marshall | 2009 - 2011 | P, t |
| (Wireless communication protocol) | | | | |

Redacted for Public Docket

**CURRICULUM VITAE**                                    Joseph C. McAlexander [III]

**Cases** (continued)

| CASE | CASE NUMBER | LOCATION | YEAR | TYPE[1] |
|---|---|---|---|---|
| Auburn* v. IBM (*firm: Fish & Richardson) | 3 09-CV-694-WHA | MD AL, Montgomery | 2009 - 2011 | P |
| (Patent related to Reliability Testing of integrated circuits) | | | | |
| ON Semi v. Hynix* et al (*firm: Quinn Emanuel) | 6:09-CV-00390 LED | ED TX, Tyler | 2009 - 2011 | P |
| (Patents related to integrated circuits) | | | | |
| Minerva* v. Motorola et al (*firm: Russ August) | 2:07-CV-00229 CE | ED TX, Marshall | 2009 - 2010 | P |
| (Patents related to mobile entertainment) | | | | |
| Minerva* v. Apple (*firm: Russ August) | 2:07-CV-00019 TJW | ED TX, Marshall | 2009 - 2010 | P |
| (Patents related to mobile entertainment) | | | | |
| Wacoh* v. ADI et al. (*firm: Clearman) | 2:09-CV-10119 | MI | 2010- 2011 | P |
| (Patent related to Testing Sensor) | | | | |
| SynQuor v. Power One* (*firm: Fish & Richardson) | 2;07-cv-497 | ED TX, Marshall | 2010 | P, t |
| (Patents related to Power Converters) | | | | |
| Freescale v. Respondents* (*firm: McDermott Will & Emery) | 337-TA-709 | ITC | 2010 - 2011 | P, t |
| (Patent related to Termination) | | | | |
| Freescale v. Panasonic et al. (Funai*) (*firm: McDermott Will & Emery) | 1:10-CV-00138-LY | WD TX | 2010 - 2011 | P |
| (Patent related to Termination) | | | | |
| PACT v. Xilinx* (*firm: Kirkland & Ellis) | 2:07-CV-563 | ED TX, Marshall | 2010 - 2012 | P, t |
| (Patents related to Programmable Data Processing) | | | | |

Redacted for Public Docket

CURRICULUM  VITAE                                    Joseph C. McAlexander [III]

Cases (continued)

| CASE | CASE NUMBER | LOCATION | YEAR | TYPE[1] |
|---|---|---|---|---|
| Opti Inc. v. SIS & Via* (*firm: Buether Joe & Carpenter) | 2:10-CV-279 | ED TX, Marshall | 2010 - 2013 | P,t |
| (Patents related to Cache Memory Snooping) | | | | |
| Avocent* v. Raritan (*firm: Davidson Berquist) | 10-CV-6100 | SD NY | 2010 - 2012 | P |
| (Patents related to KVM Switching) | | | | |
| Key Energy v. Forbes* (*firm: Kennedy Clark & Williams) | 2:08-CV-346 | ED TX, Marshall | 2010 - 2011 | P, t |
| (Patents related to Remote Access Data Capture) | | | | |
| Sandisk v. Kingston* (*firm: Fish & Richardson) | 10-CV-243 | WD WI | 2010 - 2011 | P |
| (Patents related to Flash Memory) | | | | |
| Richtek Technology v. uPI* (*firm: Haynes & Boone) | C09-05679 WHA | ND CA, SF | 2010 - 2013 | P |
| (Patents related to dc-dc Power Controllers) | | | | |
| Princeton* v. Canon (*firm: Duane Morris) | 2:10-CV-00029-TJW | ED TX, Marshall | 2010 - | P |
| (Patent related to video compression) | | | | |
| Spansion v. Samsung* (*firm: Kirkland & Ellis) | 08-855 (SLR) | DE | 2011 | P |
| (Patents related to Integrated Circuits) | | | | |
| Samsung* v. Spansion (V) (*firm: Fish & Richardson) | 1:10CV881 | (LO/JFA) ED VA, Alex. | 2011 | P |
| (Patents related to Integrated Circuits) | | | | |
| The Chamberlain Group* v. Decko et al. (*firm: Fitch Even) | 1:10-CV-07843 | ND IL, ED | 2011 - 2012 | P |
| (Patents related to garage door opener control systems) | | | | |

Redacted for Public Docket

**CURRICULUM VITAE**                                    Joseph C. McAlexander III

**Cases** (continued)

| CASE | CASE NUMBER | LOCATION | YEAR | TYPE[1] |
|------|-------------|----------|------|---------|
| Asia Optical v. Laser Technology* (*firm: Hogan Lovells) | 10-CV-251-JJF | DE | 2011 | P |
| (Patents related to laser distance mearsurement) | | | | |
| CEATS* v. Continental Airlines et al. (*firm: McDermott Will & Emery) | 6:10-CV-120 LED | ED TX, Tyler | 2011 - 2012 | P, t |
| (Patent related to interactive seating selection) | | | | |
| Lutron v. Crestron* (*firm: Quinn Emanuel) | 2:09-cv-707 | CD UT | 2011 - 2012 | P |
| (Patents related to electronic control systems) | | | | |
| Freescale v. Respondents* (*firm: McDermott Will & Emery) | 337-TA-786 | ITC | 2011 | P |
| (Patent related to Termination) | | | | |
| Alcohol Monitoring* v. BI (*firm: Latrop & Gage) DME-CBS | 11-cv-00301-DME-CBS | CO | 2011 - | P |
| (Patent related to alcohol monitoring) | | | | |
| T-Netix, Inc.* v. Pinnacle Public Services, LLC (*firm: Gruber Hurst) | 2:09-CV-00333-CE | ED TX, Marshall | 2011 - 2012 | P |
| (Patents related to penal institution telephone communication control) | | | | |
| TattleTale* v. Calfee (*firm: Cooper & Elliott) | 2:10-CV-226 | SD OH, Columbus | 2011 - 2012 | P |
| (Patents related to portable alarm systems) | | | | |
| Cypress* v. GSI et al (*firm: Morrision & Foerster) | 337-TA-792 | ITC | 2011 - 2012 | P, t |
| (Patents related to memory operation, architecture, and layout) | | | | |

Redacted for Public Docket

**CURRICULUM VITAE**                    Joseph C. M$^c$Alexander [III]

**Cases** (continued)

| CASE | CASE NUMBER | LOCATION | YEAR | TYPE[1] |
|---|---|---|---|---|
| Infineon* v. Atmel (*firm:Kirkland & Ellis) | 1:11-cv-00307 | DE | 2011 - | P |
| (Patents related to IC circuits and process) | | | | |
| Cherdak v. Rack Room* (*firm: Lathrop & Gage) | 1:11-CV-169 LO/ JFA | ED of VA | 2011 - 2012 | P |
| (Patents related to IC timing device for athletic shoes) | | | | |
| DRAM Mem Tech v. Etron* et al (*firm: Dickstein Shapiro) | 8:11-CV-000332-DOC-SS | CD of CA | 2011- 2012 | P |
| (Patents related to IC memory technology) | | | | |
| Richtek Technology v. uPI Semi.* et al (*firm: Haynes and Boone) | 337-TA-698 | ITC | 2011 - 2012 | P, t |
| (Patents related to DC-DC Controllers) | | | | |
| Solid State Storage v. STEC* (*firm: Akin Gump) | 2:11-CV-391 | ED TX, Marshall | 2011 - | P |
| (Patents related to Memory and Memory Control) | | | | |
| ParkerVision* v.Qualcomm (*firm:Allen,Dyer,McKool) | 3:11-CV-719-J-37 | MD FL, J.ville | 2011 - 2012 | P |
| (Patents related to Signal Down-Converting and Translation) | | | | |
| Monolithic Power Systems v. Silergy* (*firm: Fish & Richardson) | Cv-10-01533 CAS (AGR) | CD CA | 2011 | P |
| (Patents related to power supply boost) | | | | |
| Oracle v. Micron* (*firm: Gibson Dunn) | CV10-4340 | ND CA, San Jose | 2011 - 2012 | C |
| (Conspiracy, Agreement Compliance) | | | | |
| Grail* v. Mitsubishi et al. (*firm: Niro Haller & Niro) | 1-07-CV-098590 | SC CA, Santa Clara | 2011 - 2012 | TS, t |
| (Improper disclosure and use of Trade Secrets) | | | | |

Redacted for Public Docket

**CURRICULUM VITAE**                                    Joseph C. McAlexander [III]

**Cases** (continued)

| CASE | CASE NUMBER | LOCATION | YEAR | TYPE[1] |
|---|---|---|---|---|
| Grail* v. Renesas (*firm: Niro Haller &Niro) | C 11-03847 | ND CA, San Fran | 2011 - | P |
| (Patent related to inductive coupled memory) | | | | |
| Round Rock v. ASUS* (*firm: Perkins Coie) | 11-978-MSG | DE | 2012 - | P |
| (Patents related to die termination control and memory communication) | | | | |
| Intellectual Ventures v. Hynix* (*firm: Quinn Emanuel) | 1:10-cv-01066-UNA | DE | 2012 | P |
| (Patents related to die memory access and control) | | | | |
| Omega* v. Skypatrol et al.(*firm: Allen Dyer) | 11-24201-Civ-Moore/Torres | SD FL, Miami | 2012 - 2013 | P |
| (Patents related to vehicular tracking) | | | | |
| Creative* v. Nintendo (*firm: Barnes & Thornburg) | 2:10-cv-2735-AHM-VBK | CD CA, Western | 2012 | P |
| (Patents related to ROM memory array design) | | | | |
| Beacon v Honda* et al. (*firm: Fish & Richardson) | 337-TA-814 | ITC | 2012 | P |
| (Patents related to navigation) | | | | |
| AVM* v Intel (*firm: Goldstein) | 10-610-RK | DE | 2012 – 2013 | P |
| (Patent related to dynamic logic circuits) | | | | |
| Modec v Floatec* (*firm: Duane Morris) | 2011-68931 | Harris County, TX | 2012 - | TS |
| (Trade Secrets and Confidential Information) | | | | |
| Cian* v Aeroflex (*firm: Skiermont) | 3:11-cv-3349 | ND TX, Dallas | 2012 | P |
| (Patent related to PC Compatible Modular Based Diagnostic System) | | | | |

Redacted for Public Docket

**CURRICULUM  VITAE**                                    Joseph C. McAlexander [III]

**Cases** (continued)

| CASE | CASE NUMBER | LOCATION | YEAR | TYPE[1] |
|---|---|---|---|---|
| Cian* v Agilent (*firm: Skiermont) | 3:11-cv-3351 | ND TX, Dallas | 2012 | P |
| (Patent related to PC Compatible Modular Based Diagnostic System) | | | | |
| Cian*v.National Instruments (*firm: Skiermont) | 3:11-cv-3353 | ND TX, Dallas | 2012 - | P |
| (Patent related to PC Compatible Modular Based Diagnostic System) | | | | |
| Cian* v Pickering (*firm: Skiermont) | 3:11-cv-3354 | ND TX, Dallas | 2012 | P |
| (Patent related to PC Compatible Modular Based Diagnostic System) | | | | |
| Cian* v Spirent (*firm: Skiermont) | 3:11-cv-3356 | ND TX, Dallas | 2012 | P |
| (Patent related to PC Compatible Modular Based Diagnostic System) | | | | |
| Internet Machines v. PLX* (*firm: Baker & McKenzie) | 6:11-cv-00250-MHS | ED TX, Tyler | 2012 - | P |
| (Patent re. PCI express switch) | | | | |
| TPL v. Dell et al.*[3] (*firm: Hogan Lovells) | 337-TA-841 | ITC | 2012 - 2013 | P,t |
| (Patents related to Memory Interface Ports) | | | | |
| Wacoh* v Kionix, Inc. (*firm: Clearman Prebeg)) | 3 :12-cv-00530 | New York | 2012 - 2013 | P |
| (Patents related to inclinometer/accelerometer) | | | | |
| Solid   State   Storage   v. Fusion* (*firm: Baker Botts) | 2:11-CV-391 | ED TX, Marshall | 2013 | P |
| (Patents related to Memory and Memory Control) | | | | |

---

[3] Additional Respondents: Seiko Epson (Kirkland & Ellis), HP (Kenyon & Kenyon), Brother (Banner Witcoff), Kingston (S J Christine Yang), Fujitsu (Morrison Foerster), HiTi Digital (Eastwind Consultants), Canon (Jones Day), Acer (K L Gates), Newegg/Rosewill (Web Law)

Redacted for Public Docket

**CURRICULUM VITAE**                                    Joseph C. McAlexander [III]

**Cases** (continued)

| CASE | CASE NUMBER | LOCATION | YEAR | TYPE[1] |
|------|-------------|----------|------|---------|
| Smart Modular Technologies* v Netlist (*firm: Schwegman) | 2 :12-CV-02319-MCE-EFB | ED CA | 2012 - | P |
| Memory Modules | | | | |
| NXP v RIM* (*firm:Fish & Richardson) | 6:12-cv-498-ACC-GJK | MD FL, Orlando | 2013 - | P |
| Mask pattern density | | | | |
| Kangaroo Media* v Immersion Entertainment (*firm: Kenyon & Kenyon) | 2:12-cv-00382-JFC | WD PA | 2012 - | P |
| Audio/Video Entertainment System patent | | | | |
| Nokia* v HTC (*firm: Desmarais) | 337-TA-847 | ITC | 2012 - 2013 | P,t |
| Signal transmission and attentuation | | | | |
| LendingTree* v. Zillow et al. (*firm: Sheppard Mullin) | 3:10-CV-00439 | WD NC, Charlotte | 2013 - | P |
| (Patents related to internet lending institution access and selection) | | | | |
| Affinity* v. Clear Channel (*firm: Duane Morris) | 1 :12-CV-00205-LY | WD TX, Austin | 2013 - | P,t |
| (Patent related to broadcast content) | | | | |
| Synopsis* v. Mentor Graphics (*firm: Sidley Austin) | 3 :12-cv-06467-MMC | ND CA | 2013 - | P |
| (Patents related to logic circuit description and synthesis) | | | | |
| Affinity* v. Ford (*firm: Robins Kaplan ...) | 1 :12-cv-00580 | EDTX, Beaumont | 2013 - | P |
| (Patents related to portable audio player) | | | | |
| Affinity* v. GM (*firm: Robins Kaplan ...) | 1 :12-cv-00582 | EDTX, Beaumont | 2013 - | P |
| (Patents related to portable audio player) | | | | |

Redacted for Public Docket

**CURRICULUM VITAE**                                    Joseph C. McAlexander [III]

**Cases** (continued)

| CASE | CASE NUMBER | LOCATION | YEAR | TYPE[1] |
|---|---|---|---|---|
| Nokia* v HTC (*firm: Desmarais) | 337-TA-885 | ITC | 2013 - | P |
| (Patents related to portable electronic device housing) | | | | |
| Rothbaum v. Samsung Telecom America LLC* (*firm: Choate Hall & Stewart) | 11-10509 (MLW) | DMA | 2013 - | CL |
| (Class Action) | | | | |
| LendingTree* v. Zillow et al. (*firm: Sheppard Mullin) | 3 :10-CV-00439 FDW-DCK | WDNC, Charlotte | 2013 - | P |
| (On-Line Mortgage Loan Transactions) | | | | |

Redacted for Public Docket

CURRICULUM VITAE                                   Joseph C. McAlexander III

## OTHER CONSULTING MATTERS

I have worked with other clients in various areas of my expertise, include "system, product, and process investigation," "patent valuation," "product liability and insurance claim investigation," "quality systems consulting and engineering," and "IP licensing." This work generally relates to patents, and may involve analysis of products either defensively or offensively. In no case does any of the work involve design of circuits, processes, or systems.

Certain of these clients cannot be revealed because of confidentiality agreements. Clients may retain services preparatory to filing a suit or even name me as an expert in a number of these possible or pending cases. However, these cases have not progressed as yet to deposition, or even to protective order signing, so it would be inappropriate to reveal these clients at this time.

Non-confidentially, I have represented a radiation effects testing company, ICS Radiation Technology. Further, I have worked with investment companies, such as Hatcreek Partners, reviewing potential investment opportunities, and have participated as a technical advisor to nLine Corporation, a company that developed a product for semiconductor wafer inspection using holographic High Aspect Ratio Inspection (HARI) technology.

These and other non-confidentially related companies are:

    ICS Radiation Technology
        - Consulting work related to nuclear radiation effects testing.

    Creative Management Consultants (CMC)
        - Consulting work related to Internet services, such as access service to clients and web site hosting services; providing business co-op services.

    Hatcreek Partners
        - Hatcreek Partners is an investment firm. I served as a technical advisor in reviewing the technology of investment opportunities.

    nLine Corporation
        - Member of Technical Advisory Board
        - nLine Corp.'s business related to semiconductor holographic High Aspect Ratio Inspection (HARI) technology.

    STMicroelectronics, Inc.
        - Patent evaluation and application consulting.

    Texas Instruments
        - Patent evaluation and application consulting.

Redacted for Public Docket

CURRICULUM VITAE                                    Joseph C. M<sup>c</sup>Alexander III

## OTHER CONSULTING MATTERS

McAlexander Sound Pte Ltd
    - engineering consulting for UTAC and STATS ChipPAC

Spirit Song Youth Equestrian Academy / Spirit Song Holdings
    - Equine Psychotherapy Program for abused / traumatized youth.

Bethel Cannon Group / Bethel Cannon Holdings
    - Counseling / Event / Retreat Center property and program management.

\<end\>

Redacted for Public Docket

# ATTACHMENT B

BIGGEST ELECTRONICS ISSUE EVER ▶ 400+ PRODUCTS RATED

**DEC 10**

| RANGES & MICROWAVES PAGE 59 | GREAT WINES $10 & UNDER PAGE 56 | WHERE TO BUY ELECTRONICS PAGE 22 | BEST BUY COFFEE MAKERS PAGE 54 |

DECEMBER 2010 | CONSUMERREPORTS.ORG



# ConsumerReports®

MOST & LEAST RELIABLE CARS
Page 64

# Top TVs
# Digital cameras
# Computers
# Smart phones
# &More










Redacted for Public Docket


**COVER STORY**







A2 Motorola Droid 2



A3 Motorola
Droid Incredible

**ANDROID ASSAULT** The HTC Aria, Motorola Droid X, and HTC myTouch 3G Slide (clockwise from top left) are among the new wave of Android phones that are challenging the iPhone and BlackBerry.

# Smart phones

## More versatile and visible than ever

THE INCREASINGLY TALENTED smart phone is also increasingly on display in electronics retailers. If you're eager to try out some of the recommended models in the Select Ratings at right, there's a greater chance than ever of doing so at a Best Buy or Walmart store this holiday season, rather than exclusively at the carriers' retail stores.

Buying a phone from a general electronics store doesn't eliminate the need for contracted monthly fees. Those costs remain substantial, even though some data plans, which are required in order to use e-mail and the phone's many apps,

have dropped in price, at least for modest data users.

Here's some other news to help you shop for a smart phone:

**Big screens are more common.** Smart-phone displays keep getting larger and sharper, boosting their versatility. That can add bulk as well, though phones are also generally getting slimmer. A year ago only a handful of phones had displays of 3.5 inches or greater, but today there are more than a dozen. And resolutions have risen, to 240 pixels per inch (ppi) or higher.

**Android takes the lead.** In recent months, phones that use Google's Android operating system outsold BlackBerrys and iPhones for the first time. Android phones—including two models in Samsung's standout Galaxy S series, the Captivate (AT&T) and the Vibrant (T-Mobile)—are among the top-scoring models in our Ratings for all carriers. Two other Galaxy phones we're testing, the Fascinate (Verizon) and Epic 4G (Sprint), which has a top-notch slide-out keyboard, look promising. Although Apple's iPhone 4 is a top scorer, it isn't listed in our Ratings of recommended phones for the reason noted in the box below.

**BlackBerry isn't all business.** BlackBerry, which is known for its business-oriented phones, has come out with the BlackBerry Torch 9800 (AT&T), its most entertainment-focused phone yet.

(BlackBerry has also announced the PlayBook, a 7-inch tablet computer that appears to be aimed at some non-business users, too.)

The Torch arrived too late to be included in this report's Ratings, but based on what we've seen so far, we're impressed with its phone navigation, search, e-mail, and Web browsing. We'll rate the Torch and other new smart phones in a full cell-phone report in next month's issue, which will also feature our annual Ratings of cell-phone service by carrier.

▶ **CLOSE UP**

### We still can't recommend the iPhone 4

Apple's iPhone 4 is a standout performer in almost every respect. But in lab tests, we've found that it can have reception problems when you touch a spot on the phone's lower left side while you're in an area with a weak signal.

Apple temporarily offered free cases that remedied the problem but discontinued that program on Oct. 1. The company now says it will provide a case upon request to

the "small percentage" of buyers who need one.

We agree with Apple that not all iPhone 4 owners will experience reception difficulties. But putting the onus on owners of a product to obtain a remedy to a design flaw is not acceptable to us. We therefore still can't recommend the iPhone 4 and we call on Apple to provide a permanent fix for the phone's reception issues.



Redacted for Public


**B1 Samsung Vibrant**


**B2 HTC myTouch 3G Slide**


**C1 HTC Evo 4G**


**C2 Samsung Intercept**


**D1 Samsung Captivate**


**D2 Apple iPhone 3G S**

## Overview

All models in the chart are recommended. Those below are models that suit particular priorities. Price is based on a two-year contract from the indicated carrier, including rebates.

**Best choices for multimedia:**
A1 Motorola Droid X $200
B1 Samsung Vibrant $200
C1 HTC Evo 4G $200
D1 Samsung Captivate $200

Like other recommended choices, such as A3, C3, and D2, these phones offer fine Web browsers, multitouch displays, and access to ample apps. A1 and C1 are among the largest touch-screen displays in this group, and C1 supports Sprint's ultrafast 4G (WiMax) network. The displays on the B1 and D1 are among the best. B2 has a physical keyboard.

**Best choices for officelike tasks:**
A2 Motorola Droid 2 $200
A4 LG Ally $50
C2 Samsung Intercept $100

All are well suited for corporate e-mail access

and editing out of the box. Unlike other recommended choices, such as A5, A6, and B3, they have slide-out keyboards for easier typing. A4 delivers all-around solid performance and a generous set of features at an affordable price. C2's responsive joystick and touch screen provide easy access to main functions. A6, B4, and C4 are great for BlackBerry fans.

**Best compact choice:**
D3 HTC Aria $130

Though it's among the smallest, slimmest models, it has a spacious touch screen. The Palms (A7, C5, D4) are other fine compacts.

# Select Ratings

☑ **Recommended**

Best choices from our tests of 41 models.

● Excellent  ◕ Very good  ○ Good  ◓ Fair  ● Poor

| Recommendation | Rank | Brand & model | Price | Size | OS [1] | Overall score<br>0 — 100<br>P F G VG E | Display | Phone navigation | Voice quality | Phoning | Messaging | Web browsing | Multimedia | Battery life | Touch screen (in.) | Physical | Virtual | Wi-Fi | Camera (megapixels) | Memory-card slot | Editing included | Voice command | GPS navigation | Bluetooth data | World phone |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | **A   VERIZON** This carrier was among the most satisfying in most cities in our survey, though its plans are relatively expensive. | | | | | | | | | | | | | | | | | | | | | | | |
| ✓ | 1 | Motorola Droid X | $200 | L | A | 75 | ● | ● | ◕ | ◕ | ● | ● | ● | ◕ | 4.3 | | • | • | 8.0 | • | • | • | • | • | |
| ✓ | 2 | Motorola Droid 2 | 200 | M | A | 75 | ● | ● | ◕ | ◕ | ● | ● | ● | ◕ | 3.7 | • | • | • | 5.0 | • | • | • | • | • | |
| ✓ | 3 | HTC Droid Incredible | 200 | M | A | 73 | ● | ● | ◕ | ◕ | ◕ | ● | ◕ | ○ | 3.7 | | • | • | 8.0 | • | • | • | • | • | |
| ✓ | 4 | LG Ally | 50 | M | A | 72 | ● | ● | ◕ | ◕ | ◕ | ◕ | ○ | ◕ | 3.2 | • | • | • | 3.1 | • | • | • | • | • | |
| ✓ | 5 | Samsung Omnia II | 50 | M | W | 71 | ● | ◕ | ◕ | ◕ | ◕ | ◕ | ● | ◕ | 3.7 | | • | • | 4.9 | • | • | | • | • | |
| ✓ | 6 | BlackBerry Storm2 9550 | 150 | M | B | 70 | ◕ | ● | ◕ | ○ | ◕ | ● | ◕ | ◕ | 3.3 | | • | • | 3.1 | • | • | • | • | • | • |
| ✓ | 7 | Palm Pre Plus | 50 | S | P | 66 | ◕ | ● | ◕ | ○ | ◕ | ● | ● | ○ | 3.1 | • | | • | 3.1 | | | | • | • | |
| | | **B   T-MOBILE** This carrier earned relatively high marks for customer satisfaction in our survey and offers some of the least expensive calling plans. | | | | | | | | | | | | | | | | | | | | | | | |
| ✓ | 1 | Samsung Vibrant | 200 | M | A | 76 | ● | ● | ◕ | ◕ | ● | ● | ● | ● | 4.0 | | • | • | 4.9 | • | • | • | • | • | |
| ✓ | 2 | HTC myTouch 3G Slide | 180 | M | A | 72 | ◕ | ● | ◕ | ◕ | ◕ | ● | ◕ | ● | 3.4 | • | • | • | 5.1 | • | • | • | • | • | |
| ✓ | 3 | HTC HD2 | 150 | L | W | 71 | ● | ○ | ◕ | ◕ | ◕ | ● | ● | ◕ | 4.3 | | • | • | 5.0 | • | • | • | • | • | |
| ✓ | 4 | BlackBerry Bold 9700 | 100 | M | B | 69 | ○ | ◕ | ○ | ◕ | ● | ● | ◕ | ● | 2.4 [2] | • | | • | 3.1 | • | • | • | • | • | • |
| | | **C   SPRINT-NEXTEL** This carrier was among the lower-scoring ones for customer satisfaction in our survey yet offers highly affordable data plans. | | | | | | | | | | | | | | | | | | | | | | | |
| ✓ | 1 | HTC Evo 4G | 200 | L | A | 74 | ● | ● | ◕ | ◕ | ◕ | ● | ● | ◕ | 4.3 | | • | • | 8.0 | • | • | | • | • | |
| ✓ | 2 | Samsung Intercept | 100 | M | A | 70 | ● | ● | ◕ | ◕ | ● | ● | ◕ | ● | 3.2 | • | • | • | 3.1 | • | • | • | • | • | |
| ✓ | 3 | HTC Hero | 150 | M | A | 69 | ● | ● | ◕ | ◕ | ◕ | ● | ◕ | ○ | 3.2 | | • | • | 4.9 | • | • | | • | • | |
| ✓ | 4 | BlackBerry Bold 9650 | 200 | M | B | 68 | ◕ | ● | ◕ | ◕ | ● | ● | ◕ | ◕ | 2.4 [2] | • | | • | 3.1 | • | • | • | • | • | • |
| ✓ | 5 | Palm Pre | 150 | S | P | 66 | ◕ | ● | ◕ | ○ | ◕ | ● | ● | ◕ | 3.1 | • | | • | 3.1 | | | | • | • | |
| | | **D   AT&T** This carrier, home to the iPhone, was among the lower-scoring ones for customer satisfaction in our survey. | | | | | | | | | | | | | | | | | | | | | | | |
| ✓ | 1 | Samsung Captivate | 200 | M | A | 76 | ● | ● | ◕ | ◕ | ● | ● | ● | ● | 4.0 | | • | • | 4.9 | • | • | • | • | • | |
| ✓ | 2 | Apple iPhone 3G S (8 GB) | 100 | M | i | 74 | ● | ● | ◕ | ◕ | ◕ | ● | ● | ◕ | 3.5 | | • | • | 3.1 | | • | • | • | • | • |
| ✓ | 3 | HTC Aria | 130 | S | A | 74 | ◕ | ● | ◕ | ◕ | ◕ | ● | ● | ◕ | 3.2 | | • | • | 5.1 | • | • | • | • | • | |
| ✓ | 4 | Palm Pre Plus | 100 | S | P | 67 | ◕ | ● | ◕ | ○ | ◕ | ● | ● | ◕ | 3.1 | • | | • | 3.1 | | | | • | • | |

[1] Under OS (operating system), A is for Android; B, BlackBerry; iOS 4; P, Palm webOS; and W, Windows Mobile.  [2] Not a touch screen.

# Tablets

## iPad faces challengers

**W**HEN IT comes to tablets—handheld touch-screen computers with wireless connectivity—the Apple iPad is the trailblazer. It has already set a high standard, with an excellent 9.7-inch display, long battery life, a great app store, an easy-to-use interface, and even a decent speaker. But it's expensive, from $500 to $830. And it lacks a camera, webcam, and USB port.

Competing tablets are smaller and cheaper than the iPad are already available from Archos, Augen, and others. When we tested them, we encountered a number of problems, including inadequate touch-screen response, limited app stores, and hard-to-use controls and buttons.

### What's coming

More worthy challengers are on the way in time for the holidays, however. One of the earliest will be Samsung's Galaxy Tab. Its 7-inch display isn't as well suited for videos or books as the iPad's. But for some users, its greater portability (it weighs about half as much as an iPad) might more than make up for that disadvantage.

The Galaxy runs Google's Android 2.2, the same operating system found on some new smart phones. And it has access to apps in the same Android Market as they do. Unlike the iPad, it supports the ubiquitous Flash videos and has a rear-facing camera, plus a front-facing one for video chats. Pricing and availability weren't available at press time.

Other expected challengers include a 7-inch version of Dell's Streak; Velocity Micro's $300 Cruz, a 7-inch tablet with USB and SD-card slots; Viewsonic's ViewPad, which is supposed to be available in 7- and 10-inch versions, the latter supporting Windows 7 and Android; and new 7- and 10-inch versions of Archos' tablets.

Before shopping for a tablet, ask yourself whether another product will better meet your needs. E-book readers, for example, tend to be less expensive and their displays render text that's easier to read. But they're far less versatile. For Ratings of e-book readers, see page 40.




**TAKE IT ALONG** Tablets are appealing because they're mobile and versatile. The Apple iPad is a Web browser, video player, photo frame, e-book reader, and more. The forthcoming Samsung Galaxy Tab should have similar features but in a smaller package.

## How the iPad stacks up

Here we compare Apple's tablet computer with other types of portable devices. The specs and judgments are for a typical model of each that's closest in screen size to the iPad.

Better ← ⊕ ⊖ ○ ⊖ ● → Worse

|  |  | iPad | Laptop | Netbook | E-book reader |
|---|---|---|---|---|---|
|  | Overview | The best combination of versatility and portability. Great navigation, thanks to its touch screen. But it can't play Flash videos and has no USB port. | Most powerful but least portable. Full-size physical keyboard and huge storage are ideal for work-oriented tasks. It also handles powerful games. | A less powerful laptop with a smaller screen and keyboard and processing that can't handle cutting-edge games. Battery life is often better than a laptop's, though. | Best for book reading. The Kindle DX rivals the iPad or a netbook in screen size, and its type is easier to read. But its monochrome screen and browser limit its versatility. |
|  | **Price** | $500+ | $700 | $300 | $380* |
|  | **Weight** | 1.5 lb. | 4.5 lb. | 2.9 lb. | 1.2 lb. |
| **RELATIVE PERFORMANCE** | **Portability** | ⊖ | ● | ○ | ⊖ |
|  | **Reading documents** | ⊖ | ⊕ | ⊕ | ⊖ |
|  | **Reading e-books** | ⊖ | ⊖ | ⊖ | ⊕ |
|  | **Reading periodicals** | ⊕ | ○ | ○ | ● |
|  | **Web surfing** | ⊕ | ⊖ | ⊖ | ● |
|  | **E-mail** | ⊖ | ⊕ | ⊕ | Not possible |
|  | **Viewing photos** | ⊖ | ⊖ | ⊖ | ● |
|  | **Viewing videos** | ⊖ | ⊕ | ⊖ | Not possible |
|  | **Writing/editing documents** | ⊖ | ⊕ | ⊖ | Not possible |
|  | **Typing** | ○ | ⊕ | ⊖ | ● |
|  | **Gaming** | ○ | ⊖ | ○ | Not possible |
| **SPECIFICATIONS** | **Battery life** | 1 or 2 days | ½ day | 1 day | 1 week |
|  | **Screen** | 9.7-in. touch | 13.3 in. | 10.1 in. | 9.7 in. |
|  | **Storage** | 16GB+ | 500GB | 160GB | 4GB |
|  | **GPS** | • |  |  |  |
|  | **Camera** |  | • | • |  |
|  | **Allows apps** | • | • | • |  |
|  | **Free wireless** | Wi-Fi | Wi-Fi | Wi-Fi | 3G |
|  | **Paid wireless** | 3G | 3G/4G | 3G/4G |  |

*Price is for the third-generation Kindle DX. The second-generation Kindle DX remains available and costs $360.

Redacted for Public Docket