# EXHIBIT A

# FILED UNDER SEAL –
# LEAVE GRANTED ON JANUARY 17, 2014
# (DKT. NO. 87)

## UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| AMY ROTHBAUM, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | NO. 11-CV-10509-MLW |
| SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, | ) ) ) | |
| Defendant. | ) ) ) | |

## CONFIDENTIAL EXPERT REPORT OF KEN THOMPSON
## PURSUANT TO FED. R. CIV. P. 26 (a)(2)

## STATEMENT OF OPINIONS and REASONS FOR OPINIONS

### I.    A PRIMER ON THE SAMSUNG GALAXY S SMART PHONES

The Samsung Galaxy S is a touch screen–enabled, slate-format Android design smartphone. The smartphone that is the subject of this Expert Report is a Samsung Galaxy S Model SGH-I897 smartphone sold by AT&T under the name "Captivate." The Captivate line was first offered for sale in the United States on July 18, 2010, and the features and specifications of the Captivate phones can be found at the following url address: http://www.samsung.com/us/mobile/cell-phones/SGH-I897ZKAATT-specs.

According to documents produced by Defendant in this litigation, ███████████

█████████████████████████████████████████████████████████████████████

███████████ *See* STA_ROTH 0000473.

Based on my examination of the Plaintiff's phone, Plaintiff's phone is a Samsung Captivate phone with an International Mobile Station Equipment Identity ("IMEI") number of 351863 04 041691 5 ("Plaintiff's Captivate Phone").[1]

## II.      THE RANDOM SHUT DOWN DEFECT

I have been asked to render my expert opinions on whether: (i) Plaintiff's Captivate Phone is defective, and if this phone is defective, the nature and cause of the defect; and (ii) the Captivate phones sold in the United States are defective, and if so, the nature and cause of the defect(s).

Based on the work that I have performed in this litigation, it is my expert opinion that:

(i)      Plaintiff's Captivate Phone is defective because this phone was designed and manufactured in a way that causes this phone to randomly power itself off when it is in "sleep" mode without any human intervention; and

(ii)     the Captivate phones sold in the United States are defective for this same reason, namely because they too were designed and manufactured in a way that causes these phones to randomly power themselves completely off when they are in "sleep" mode without any human intervention.

Both of the foregoing expert opinions are based on my having:

(i)      tested Plaintiff's Captivate Phone and observed this phone randomly powering itself off when it was in "sleep" mode without any human intervention.  In testing Plaintiff's Captivate phone, I charged and powered it on on October 25, 2013.  Thereafter, I performed one re-charge of Plaintiff's Captivate Phone on October 30, 2013.  During this 6 day period, I observed that Plaintiff's Captivate Phone experienced one random shut down event.

---

[1]      An IMEI number is a unique 15 digit serial number assigned to every wireless phone/device. *See* http://www.att.com/esupport/article.jsp?sid=KB100016&cv=820#fbid=t1x4st8VGPn.

(ii)      read and analyzed internal Samsung and AT&T documents produced by Defendant in this case which confirm the existence of the defect defined in ¶ 1 of Plaintiff's Second Amended Class Action Complaint ("SAC") as the "Random Shut Down Defect." The following documents that I reviewed and analyzed confirm the existence of the Random Shut Down Defect in both Plaintiff's Captivate Phone and the other Captivate phones sold in the United States.

A.      A document entitled "SGH-I897███████Technical Information Bulletin" dated February 1, 2011 and bearing Bates Stamp No.: STA_ROTH 0000004 states in relevant part, ████████████████████████████████████████████ ████████████████ (Emphasis added).

B.      A document entitled ███████████████████████ dated March 25, 2011, and bearing Bates Stamp No.: STA_ROTH 0000547-598, at STA_ROTH 0000551 states in relevant part: ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████[2] (Emphasis added).

C.      An internal AT&T email entitled "Samsung Feedback" dated March 2, 2011 sent from an AT&T employee to several Samsung employees and bearing Bates Stamp No.: STA_ROTH 0000134 states in relevant part: ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████ (Emphasis added).

D.      A document entitled ████████████████████████ bearing Bates Stamp No.: STA_ROTH 0000169-184 at STA_ROTH 0000174 is an "i897 Return Analysis" and states in relevant part that, ████████████████████████████



---

[2]      Based on my review of: (i) the documents produced by Defendant, and (ii) the Report prepared by Samsung Engineer Matthew Chung, I confirmed that Defendant has not yet produced any dV/dt test and measurement results in this litigation.

████████████████████████████████████████████████████

████████████████ (Emphasis added).

     E.     A document entitled ████████████████████████ dated June 29, 2011, and bearing Bates Stamp No.: STA_ROTH 0000420 contains the following graph depicting the percentage of Captivate phones returned due to defects and the reasons for such returns expressed in percentage terms. ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████

2010/2011 Monthly CTI Trend (% of total exchanged)

**HIGHLY CONFIDENTIAL**                                                  **STA_ROTH 0000420**

**F.**     Document bearing Bates Stamp No.: STA_ROTH 0000472 is a similar graph depicting the percentage of Captivate phones returns due to defects and the reasons for such returns expressed in percentage terms for the period September 2010 through July 2011, which was the "End of Life" or "EOL" for the Captivate phones.[3] ████████████████████

████████████████████████████████████████████████████████

████████████████████



2010/2011 Monthly CTI Trend (% of total exchanged)

**HIGHLY CONFIDENTIAL**                                        **STA_ROTH 0000472**

---

[3]     "End of Life" or "EOL" refers to the date on which Samsung stopped manufacturing and selling the Captivate phones.

### III.   SAMSUNG FAILED TO REMEDY THE RANDOM
####      SHUT DOWN DEFECT IN THE CAPTIVATE PHONES

Based on my testing of Plaintiff's Captivate Phone and my review and analysis of the internal Samsung and AT&T documents produced in this litigation, it is my further expert opinion that:

(i)     although Samsung attempted to remedy the Random Shut Down Defect in at least three ways, Samsung failed to do so;

(ii)    as a result of Samsung's failure to remedy the Random Shut Down Defect, Plaintiff's Captivate Phone is defective; and

(iii)   as a result of Samsung's failure to remedy the Random Shut Down Defect, the other Captivate phones sold in the United States are also defective because they, too, were designed and manufactured in a way that causes these phones to randomly power themselves completely off when they are in "sleep" mode without any human intervention.

Both of the foregoing expert opinions are based on my having:

(i)     tested Plaintiff's Captivate Phone, which randomly powered itself off when in "sleep" mode without any human intervention and;

(ii)    read and analyzed internal Samsung and AT&T documents produced by Defendant in this case which confirm that Samsung failed to remedy the Random Shut Down Defect in Plaintiff's Captivate Phone and the other Captivate phones sold in the United States.

The following documents that I reviewed and analyzed confirm that Samsung failed to remedy the Random Shut Down Defect in Plaintiff's Captivate Phone and the other Captivate phones sold in the United States.

A.   A May 26, 2011 email ███████████████████████████████
████████████████████████████████████████████████████████
█████████████████████████████████████████ This email states in relevant

part: ████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████ ██████ ██████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

*See* STA_ROTH 0000304.

      B.    A March 30, 2011 internal Samsung email also █████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████ *See* STA_ROTH

0000186

      C.    ████████████████████████████████████████████

█████████████████████████████████████████████████████████

STA_ROTH 0000473 ███████████████████████████████████████████

████████████████████████████

## IV. TESTING OF PLAINTIFF'S CAPTIVATE PHONE DEMONSTRATES THAT PLAINTIFF'S CAPTIVATE PHONE IS DEFECTIVE

    I received Plaintiff's Captivate Phone on or about October 25, 2013. Upon receipt of Plaintiff's Captivate Phone, I performed a visual inspection during which I confirmed that the IMEI number of Plaintiff's Captivate Phone is 351863 04 041691 5.

      i.    Following this visual inspection, I charged and powered on Plaintiff's Captivate Phone on October 25, 2013. Thereafter, I performed one re-charge of Plaintiff's Captivate Pone on October 30, 2013;

      ii.    During this 6 day period, I observed that Plaintiff's Captivate Phone experienced one random shut down event when it was in "sleep" mode without any human intervention;

iii.     Based on the foregoing testing, it is my expert opinion that Plaintiff's Captivate Phone is defective because Plaintiff's Captivate Phone randomly powered itself off when it was in "sleep" mode without any human intervention because of the Random Shut Down Defect.

## FACTS and DATA CONSIDERED IN FORMING OPINIONS

The opinions offered by me in this Expert Report are based on materials and data available to me as of the date of this report.  I reserve the right to modify or supplement my opinions in the event that I become informed of additional facts.  I have not yet provided any testimony in this case.  In preparing to provide testimony, I expect to continue my review, evaluation and analysis of information produced during discovery.

In performing my work in this case, I reviewed, considered and relied on: (i) my independent study of the discovery materials produced by Samsung in this litigation, (ii) pleadings in this litigation; (iii) my expertise and prior work experience involving, among other things, extensive experience in portable Rf transceiver products including mobile phones, 2-way radios, and pagers which involved product development, product manufacturing, product electrical testing, product reliability assessment, and Quality Management and corrective actions for products in field use, (iv) general electronic troubleshooting and analysis involving suppression or attenuation of transient voltages in battery powered communication products; and (v) my training and education.  In performing my work in this litigation, I personally consulted technical documents including general datasheets on tantalum and ceramic capacitors, the IEMI naming convention, and transient voltage suppression and would testify competently to the facts and opinions set forth herein if called upon to do so.

## EXHIBITS TO BE USED TO SUPPORT EXPERT OPINIONS

I may rely on documents and things that have been, or will be, produced in this litigation as exhibits to my testimony. I have not yet selected which exhibits, if any, I will use for such testimony. I may also use demonstrative exhibits such as charts, models or videos. Those exhibits have not yet been prepared.

## QUALIFICATIONS, PUBLICATIONS and PRIOR TESTIMONY

I am the owner of OKEN's Red-X, a California sole-proprietorship, specializing in analysis of packaged Integrated Circuit devices ("ICs") for various product conformance issues including materials analysis, mechanical failure analysis, mechanical/reliability robustness, basic electrical testing, automated test development for small run, high I/O PCB assemblies. I often engage in consulting work for various customers involving electronic devices, operations management, and manufacturing development.

I have worked in the electronics industry for over 31 years including special focus on solder assembly technology, solder joint reliability of surface mounted packages, IC packaging development, operations management of electronic product manufacturing and supply chains, quality assurance of manufacturing operations and products in field use, management of product development, and managing resolution of mobile and hand-held electronic product failures. A critical part of my work with Motorola was continuous quality improvement. I was trained in the art of capturing product or manufacturing defects, performing pareto analysis, testing for and identifying root cause using statistical methods/processes including 6 Sigma, DOE, 8-D, ANOVA methods. Those efforts included numerous new product introductions. Product quality and field reliability prior to product launch were assessed with Accelerated Life Testing environments. . Failure Mode Effects & Analysis were correlated to product failures and return rates from field use. These Quality Metrics were key drivers towards customer satisfaction and included Initial Field Quality (failures, issues, returns within the 1st 30 days) and Warranty returns and/or repairs.

I received my Bachelor of Science degree in Mechanical Engineering in 1982 from the Georgia Institute of Technology. As an undergraduate, I participated in the co-operative work program which included three quarters of employment with the Metallurgical Department of Southern Railway's (now Norfolk Southern) Research and Test Department in Alexandria, Virginia where I focused on failure analysis of various metal-based components and/or tools utilized in railway carrier operations.

Before starting OKEN's Red-X in 2008, my employment history began with Motorola in 1982 as a process engineer in the solder assembly and packaging operations of the Microelectronic Division, a part of Motorola's Communication Sector. In this position I was responsible for all aspects of manufacturing and engineering of electronic modules and assemblies involving surface mount technology and miniaturization. I worked on New Product Introduction programs including the first handheld cellular telephone, the Dynatac 8000X, and was instrumental in failure analysis and project management resolution of several critical product reliability issues.

In 1985, I was recruited to Motorola's Advanced Manufacturing Technology department with a key focus on the solder joint reliability of IC packages applied to 2-way radios, pagers, cell-phones, and mobile phones. My role was to validate and guide progress design rules for new products and IC packages as they pertained to Printed Circuit Board ("PCB") layout, solder geometries, PCB materials, and IC package surface patterns and finishes. During that time, I developed automated data acquisition tools to monitor the solder joint reliability of IC packages in-situ for thermal cycle, thermal shock, vibration, bending, drop/shock, power-cycling, and biased humidity.

I was a key member of the Motorola team that developed the Ball Grid Array ("BGA") IC packaging technology. In the past 20 years, this packaging method has grown to dominate the industry in higher pin count devices. I performed design, manufacturing, material selection, reliability testing, and electrical parameter testing on most aspects of the technology. Upon completion of this work, I transitioned to Operations Manager for a critical automated product assembly line of a new 2-way radio product. The product introduction was performing poorly,

defect quality was high, volume production was challenged, and financial results were lacking. My role included management of dozens of manufacturing and test engineers.   Within 10 months, major stable improvements in quality and performance were achieved.

As Technical Operations Manager for Motorola Indala in San Jose, California, beginning in 1994, I was responsible for developing manufacturing processes and equipment for the production of IC modules, Radio Frequency Identification ("RFID") tags and cards, and RFID reader products. I was a key member in the IC packaging design, development, and qualification effort. Technical accomplishments were recognized with peer and management election into Motorola's Science Advisory Board Association ("SABA") in 1996. The SABA organization consisted of approximately 400 accomplished technologists among its more than 124,000 employees worldwide. With the incorporation of the Motorola Indala division into Motorola's Worldwide Smartcard Solutions Division, my responsibilities shifted to development and manufacturing of contactless and dual-interface (combi) cards. The critical component in card products was the IC module which I developed in several forms. Returning to the RFID business side as Director of Operations, I led the efforts to develop and refine the packaging and high-volume industrialization of smart label tags using automated reel to reel processing of flip chip die.

Motorola sold its RFID business, whereupon I became Vice President of Operations and General Manager of Indala, a part of Assa Abloy.

In 2003 and 2004, I was Director of Prototyping and Production Engineering Services and Technology Transfer at Tessera, Inc.  Tessera specialized in developing and licensing IP for IC packaging and rapidly grew its market value.

As an independent consultant from 2004 to 2008, I performed work for various clients in the electronics industry under Professional Services Agreements.  From 2006 to 2008, I was Director of Card Integration at QSecure, Inc. with responsibilities to develop packaging and supply chain capability for credit card products with embedded electronics having a flip chip MEMS die, supporting circuitry, and a battery.

I have presented several technical papers concerning electronics domestically and internationally including the International Electronics Materials and Technology Conference in Japan, CardTech/SecureTech in Miami, International Symposium on the Ubiquitous Society/RFID in Korea, and the Surface Mount Technology Association conference in California. I currently hold 11 U.S. patents involving IC packaging and surface mount technology.

I have not provided expert testimony at trial or by deposition in any action in the previous four years. I am being compensated for my work in this case in accordance with the rates in my current Rate Schedule as follows:

Consulting Rate    $260/hr

Testimony Rate    $380/hr

Travel Rate    $135/hr

Dated:    October 31, 2013                    Ken R. Thompson — 10.31.13

                                        Ken Thompson