UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

AMY ROTHBAUM, individually and    )
on behalf of all others           )
similarly situated,               )
    Plaintiff,                    )
                                  )    C.A. No. 11-10509-MLW
    v.                            )
                                  )
SAMSUNG TELECOMMUNICATIONS         )
AMERICA, LLC,                     )
    Defendant.                    )

MEMORANDUM AND ORDER

WOLF, D.J.                                    September 29, 2014

I.   INTRODUCTION

    This case is a putative class action brought by plaintiff Amy Rothbaum against defendant Samsung Telecommunications America, LLC ("Samsung").  Rothbaum alleges that Samsung knowingly sold its Captivate, Fascinate, Vibrant, and Epic 4G phones (collectively, the "Samsung Phones") with a design defect that causes the phones to shut down randomly (the "Random Shut Down Defect").  Rothbaum alleges that Samsung was aware of this defect, but continued to sell the defective phones, and its express warranty provided an inadequate remedy because it only required the defendant to exchange her defective phone for another defective phone. Accordingly, Rothbaum alleges that Samsung violated Massachusetts and Texas laws governing the implied warranty of merchantability. Rothbaum also alleges a violation of M.G.L. Chapter 93A.  Rothbaum brings this action on behalf of a putative class of all persons who purchased a new Samsung Phone manufactured, distributed, or sold by

Samsung from July 2010 to present.

In May 2012, the court denied Samsung's motion to dismiss, concluding that Rothbaum had stated a claim for a violation of the implied warranty of merchantability under Massachusetts law because she had plausibly alleged that the phones were defective and that Samsung's attempted remedy, a replacement phone, failed of its essential purpose. The court also allowed Rothbaum to file a Second Amended Complaint to add a claim under Chapter 93A, concluding that the amendment was not futile. The court deferred consideration of Rothbaum's claim under Texas law.

Following the close of discovery, Samsung filed a motion for summary judgment. This motion focuses on the phone that Rothbaum received in March 2011 (the "Replacement Phone"), which replaced the original Samsung Phone she purchased in October 2010. Samsung argues that there are no genuine disputes of material fact and that there is no competent evidence that Rothbaum's Replacement Phone is defective in a manner that violates the implied warranty of merchantability. More specifically, Samsung argues that there is no evidence that the Replacement Phone was defective upon receipt, that there is no evidence that her phone has the defect alleged in the Second Amended Complaint, and that Samsung has offered a complete remedy that Rothbaum has improperly rejected. Samsung has also filed a motion to exclude the expert report of Kenneth Thompson, an engineer who examined Rothbaum's Replacement Phone and

reviewed Samsung's internal documents to determine the prevalence of the Random Shut Down Defect.

For the reasons explained below, the defendant's motion to preclude the expert report and the defendant's motion for summary judgment are being allowed. In essence, even when viewed in the light most favorable to Rothbaum, the evidence is insufficient to permit a reasonable factfinder to conclude that any Random Shut Down Defect caused more than a mere inconvenience to Rothbaum, and such an imperfection in a product does not violate the implied warranty of merchantability. Nor does it permit a finding that Chapter 93A has been violated. As Thompson's opinion that 100% of the Samsung Phones are defective is inadmissible under Federal Rule of Evidence 702, and there is no other evidence to support such a conclusion, Samsung at most failed to disclose a potential problem and that would not constitute a violation of Chapter 93A. Therefore, judgment will be entered for the defendant.

II. PROCEDURAL HISTORY

    A. <u>The Motion to Dismiss and the Motion to Amend</u>

Rothbaum filed her original Complaint on March 24, 2011, and filed an Amended Complaint as a matter of right on April 7, 2011. The defendant filed a Motion to Dismiss on June 30, 2011. In response, Rothbaum filed a Motion for Leave to File Second Amended Complaint (the "Motion to Amend"), seeking to: add three new types of phones to the list of allegedly defective Samsung phones; add an

allegation that she purchased the phone separate and apart from any wireless service contract; and add a claim under M.G.L. Chapter 93A, §§2, 9.

In support of the Motion to Dismiss and in opposition to the Motion to Amend, Samsung argued that: (1) the Uniform Commercial Code ("UCC") does not apply to Rothbaum's purchase of the phone because it was made pursuant to a contract for telecommunications services; (2) Rothbaum's individual breach of warranty claim fails because she did not provide Samsung with the required notice and an opportunity to cure the defect; (3) Rothbaum's Class claim fails because she has not alleged that the Class members provided individualized notice of the defect; (4) Rothbaum's Texas law claim fails because Texas law does not apply to the purchase of her phone under a choice-of-law analysis; and (5) Rothbaum failed to state a valid Chapter 93A claim. Rothbaum opposed all of these arguments.

At the May 31, 2012 hearing and in a subsequent Order, the court denied Samsung's Motion to Dismiss with regard to Count I (breach of implied warranty) and Count II (Chapter 93A). See May 31, 2012 Order ¶2. The court reserved judgment on Count III of the Second Amended Complaint, which alleges breach of implied warranty under Texas law, for decision on class certification or summary judgment. See id.

The court explained these rulings at the May 31, 2012 hearing. First, the court concluded that it was plausible that the UCC

applies to the contract. See May 31, 2012 Tr. 21:1-2. The court explained that it was unclear whether Rothbaum had signed a bundled contract for both the phone and the underlying phone services, and that further factual development would be necessary before the claim could be dismissed on that ground.[1] Second, the court concluded that Count I should not be dismissed for lack of notice to Samsung, see id. 22:1-4, because it was not clear from the face of the Complaint that Samsung was prejudiced by a lack of notice, and that even if no notice had been given directly to Samsung, the court assumed for purposes of the Motion that notice to the retailer, AT&T, was sufficient, see id. 23:4-14.[2] Third, the court found that Rothbaum had plausibly alleged that Samsung's proposed remedy -- a replacement phone -- failed of its essential purpose because it would have been defective as well, and therefore there was no obligation to provide an opportunity to cure. See id. 24:18-21. Finally, the court found that the addition of the Chapter 93A claim in the proposed Second Amended Complaint would not be futile, see id. 28:17-19, because such a claim would rise or fall with the claim of breach of the implied warranty of merchantability, see id. 29:2-15.

B. <u>Protective Order, September 2013 Scheduling Conference,</u>

---

[1] Samsung has not renewed this argument in its motion for summary judgment.

[2] Again, Samsung has not renewed this argument in its motion for summary judgment.

<u>and Summary Judgment Briefing</u>

On December 21, 2012, the parties filed a Joint Motion for a Protective Order (Docket No. 55), which the court "allowed with amendments." <u>See</u> April 19, 2013 Order.

The scheduling conference on September 16, 2013 was largely devoted to discussing the issues for a possible motion for summary judgment. The defendant explained that it wished to file a targeted motion for summary judgment, prior to class certification, on the threshold issue of whether Rothbaum's phone actually has the defect alleged. The court explained that:

> If it's going to turn out that Ms. Rothbaum is subject to some unique defense because her phone is not defective or not defective in the manner alleged in the . . . Second Amended Complaint . . . , it's important to find [out] sooner rather than later.

Sept. 16, 2013 Tr. 38:12-16. The court also stated that, if it became apparent that Rothbaum would not be an adequate representative because of a unique defense, "since the complaint has been amended twice, [it would] not permit[] a motion to amend to add additional class representatives." <u>Id.</u> 24:11-13.

The parties also discussed the issue of expert testimony. The defendant had already had one of its engineers examine Rothbaum's phone. Although Rothbaum had an expert who had examined the phone, she had not designated that expert as one who would testify.

As memorialized in the September 18, 2013 Order, the court ordered the defendant to file the report of its expert, <u>see</u> Sept.

18, 2013 Order ¶1, and to produce any records relevant to its expert's conclusion that Rothbaum's phone appeared to have a construction consistent with a manufacturing change, id. ¶2. The court also ordered the plaintiff to file by October 31, 2013 any affidavits in support of her claim that her phone has the alleged Random Shut Down Defect and disclosures concerning any expert testimony. Id. ¶3. In addition, the court ordered the defendant to make its expert disclosures by December 2, 2013. Id. ¶5. The court established a briefing schedule for summary judgment, id. ¶¶8-11, which was subsequently extended, see Feb. 21, 2014 Electronic Order.

Samsung filed its Motion for Summary Judgment and its Motion to Preclude the Expert Report of Ken Thompson. Rothbaum filed oppositions to both motions. The court held a hearing on both motions on August 28, 2014, and took the motions under advisement.

The court subsequently issued an Order directing the defendant to submit a memorandum concerning whether, prior to issuing this Memorandum and Order publicly, the court should provide the defendant an opportunity to propose the redaction of citations to particular information in sealed documents. See Aug. 29, 2014 Order at 1. The Order stated that if the defendant wished to propose redactions it should explain why the information at issue justifies an exception to the general "presumption that the public ought to have access to judicial records," especially "to

'materials on which a court relies in determining the litigants' substantive rights.'" Fed. Trade Comm'n v. Standard Fin. Mgmt. Corp., 830 F.2d 404, 408 (1st Cir. 1987) (quoting Anderson v. Cryovac, Inc., 805 F.2d 1, 13 (1st Cir. 1986)).

On September 4, 2014, Samsung reported that it did "not object to the accurate citation of information contained in [its sealed] documents" and, therefore, did not request an opportunity to propose redactions of such citations in this Memorandum and Order. Memo. of Non-Objection by Def. STA at 2.

III. MOTION TO PRECLUDE EXPERT REPORT

The resolution of the Defendant's Motion to Preclude the Expert Report of Ken Thompson affects the evidence that the court may consider when deciding the motion for summary judgment. It is, therefore, being decided first.

Thompson's expert report expresses two material opinions. First, Thompson concludes that "Plaintiff's Captivate Phone is defective because this phone is designed and manufactured in a way that causes this phone to randomly power itself off when it is in 'sleep' mode without any human intervention." Thompson Report at 2, Barnes Decl. Ex. A. Second, Thompson states that "the Captivate phones sold in the United States are defective for this same reason." Id. As Thompson clarified at his deposition, it is his opinion that "100 percent of [such phones] are defective." See Thompson Dep. at 70:14-17, Barnes Aff. Ex. J.

8

For the reasons explained below, the court is allowing the defendant's motion and excluding the Thompson report. His expert opinion is based on minimal personal observation of the plaintiff's phone, and a highly selective and distorted reading of documents provided by the defendant. It is, therefore, not sufficiently reliable to be admitted as evidence.

A.   Standard of Review

In deciding a motion for summary judgment, the court may consider only evidence that would be admissible at trial or could be presented in admissible form. See Fed. R. Civ. P. 56(c)(2); Gorski v. N.H. Dep't of Corr., 290 F.3d 466, 475-76 (1st Cir. 2002); Vazquez v. Lopez-Rosario, 134 F.3d 28, 33 (1st Cir. 1998).

The admissibility of expert evidence is evaluated under the standards established by the Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993). The district court acts as a gatekeeper to ensure the reliability of proposed expert testimony. Federal Rule of Evidence 702, which codified Daubert, sets forth the standards to be applied:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Factors to determine the reliability of a theory or technique include whether the theory or technique has been tested and subjected to peer review and publication, the known or potential error rate, and the acceptance of the theory or technique within the relevant scientific community. Daubert, 509 U.S. at 593-94. These factors are flexible and are designed to focus the court on the "evidentiary relevance and reliability" of the proposed testimony. Id. at 595.

It is often, but not always, inappropriate to exclude expert evidence in deciding a motion for summary judgment. As explained by the First Circuit:

[G]iven the complex factual inquiry required by Daubert, courts will be hard-pressed in all but the most clearcut cases to gauge the reliability of expert proof on a truncated record. Because the summary judgment process does not conform well to the discipline that Daubert imposes, the Daubert regime should be employed only with great care and circumspection at the summary judgment stage.

* * *

[C]ourts must be cautious — except when defects are obvious on the face of a proffer — not to exclude debatable scientific evidence without affording the proponent of the evidence adequate opportunity to defend its admissibility.

Cortes-Irizarry v. Corporaci on Insular De Seguros, 111 F.3d 184, 188 (1st Cir. 1997). Furthermore, credibility and weight are left

to the jury and are not to be dealt with as a matter of <u>Daubert</u> gatekeeping. <u>Seahorse Marine Supplies, Inc. v. Puerto Rico Sun Oil Co.</u>, 295 F.3d 68, 81 (1st Cir. 2002).

B. <u>Discussion</u>

As indicated earlier, Thompson's report involves two separate sections: his observations of Rothbaum's Replacement Phone, which is the centerpiece of this litigation, and his analysis of Samsung's internal documents.

1. <u>Thompson's Observations of the Samsung Phones</u>

Samsung argues that Thompson did not apply any expertise to his observations of the plaintiff's Replacement Phone. The evidence demonstrates that Samsung is accurate in explaining that:

> Thompson did not attempt to determine the state of the Replacement Phone when he received it. Thompson Dep., Barnes Aff., Ex. J, at 75:3-8. He did not document what applications were installed and active on the phone. He did not conduct any power testing. He did not insert a SIM card; and therefore, the phone was not able to send or receive signals. <u>Id.</u> at 77:25-78:11. He did not attempt to use the camera, video, or Internet browsing functions on the phone. <u>Id.</u> at 79:5-11; McAlexander Report, ¶¶53-68.

Memo. in Supp. of Mot. to Preclude at 6. Instead, Thompson only pressed the "On" button periodically to determine whether the phone had shut down. <u>See</u> Thompson Dep. 79:16-85:1, Barnes Aff. Ex. J.

Although the plaintiff argues that Thompson's methodology was comparable to that employed by Matthew Chung, the Samsung engineer who examined the phone, the record reveals that Chung's analysis was significantly more thorough than Thompson's. <u>See</u> section V.A,

11

<u>infra</u>. Chung performed several tests that Thompson did not, such as ordinary use of the phone, voltage measurements, and examination of the phone's internal components. <u>See</u> Chung Report ¶¶4, 8-9.

The court is allowing the defendant's motion to exclude Thompson's expert testimony with respect to the portion of Thompson's report related to his personal observation of the Replacement Phone. As the defendant correctly argues, Thompson's observations required no expertise, and he did not employ his expertise in ways that might have been more illuminating, for example by examining voltage levels or evaluating power consumption. There appears to be no methodology to Thompson's observations that would be beyond the ken of the layperson.

However, Thompson has admissible evidence as a fact witness concerning what he observed. As required by Rule 602, Thompson has personal knowledge about the Replacement Phone's propensity to shut down while in sleep mode, which is relevant to Rothbaum's claim that her phone shut down occasionally.[3] However, as he did not use his undisputed expertise to evaluate Rothbaum's phone, Thompson is precluded from offering expert testimony as to the ultimate cause of such shutdowns, particularly whether the shutdowns were caused by a defect in the phone or instead due to software Rothbaum had

---

[3] The defendant appears to acknowledge the possibility of Thompson's eligibility to testify as a fact witness. <u>See</u> Memo. in Supp. of Mot. to Preclude at 19 ("At most, this is fact testimony.").

12

added to the phone as apps, as Samsung contends.

### 2. Thompson's Analysis of Samsung Documents

Samsung also argues that Thompson's opinion that 100% of the Samsung Phones were defective is not supported by the evidence. The court is able to evaluate this argument by reading the Samsung documents on which it relies. Having done so, it finds obvious deficiencies in Thompson's opinion, which render it inadmissible even for the purposes of summary judgment. Cf. Cortes-Irizarry, 111 F.3d at 188.

### a. Pre- and Post-Remedy Samsung Phones

The first significant methodological deficiency in Thompson's analysis is his failure to differentiate between early and later batches of the Samsung Phones. As the parties agree, and Samsung's documents confirm, in early November 2010, Samsung revised its manufacturing process in an attempt to remedy a random shutdown problem exhibited in early batches of the Samsung Phones. See Barnes Aff. Ex. I at 9. Thompson frequently cites Samsung documents that deal with the pre-remedy phones for the broader proposition that all of the phones are defective, including Rothbaum's replacement phone which the parties agree was manufactured after early November, 2010.

For example, at page 3 of his report, Thompson cites an internal Samsung March 25, 2011 document dated entitled "AT&T Product Status Performance," which states that the phone "[w]ill

13

not wake up from sleep mode and powers off.  Analysis showed that there was unwanted power-off in PMIC circuitry after large dV/dt on battery voltage and prevented device to [sic] wake up properly." See Barnes Aff. Ex. I at 6 (Docket No. 98-8).

However, Thompson ignores the next two lines of the document, which states that: "SVC line will replace the current tantalum capacitor with a ceramic capacitor to prevent this failure. Starting 12/2010 Production."  Id.  In other words, this document indicates that the statements on which Thompson relies relate to a phone produced before the November 2010 attempted "fix."

Similarly, Thompson overlooks another page in the same report, which states that "[d]ue to growing concern" about the shutdowns, "200 returned [phones] were sampled that has [sic] Power on/off CTI to assess the actual root cause."  Id. at 9.  This sample revealed that "43 units reproduced the powering off symptom, 22%" and that "[a]ll 43 units are produced before corrective action (11/6/2010). After applying HW changes, powering off is resolved . . . ."  Id. Although post-November 2010 phones made up a small percentage of the sample, Thompson does not recognize the distinction between phones produced before and after November 2010.  Moreover, even with regard to the phones produced before November 2010, the document on which Thompson relies does not permit the reasonable conclusion that 100% had a Random Shut Down Defect.

> b. Conflation of All Power-Related Returns with the Random Shut Down Defect

In addition, Thompson's report involves another methodological flaw of repeatedly conflating returns for _any_ power-related problem with returns related to the Random Shut Down Defect.

For example, on page 3 of his report, Thompson cites the "I897 Galaxy-S Return Status & Corrective Action" report. <u>See</u> Barnes Aff. Ex. D. Thompson states that "during the period August 2010 through February 2011, 48% of all returned Captivate phones sold in the United States were returned because of the Random Shut Down Defect." Thompson Report at 3. He does not cite a specific page of that document, and it does not include a statement that matches the statement in his report. He is apparently referring to a chart on page 7 of the document.

It is evident, however, that Thompson has misconstrued the data. The chart on page 7 shows that 48% of all returns were because the "phone powers on/off." The document then further breaks down that figure, stating that of that 48%:

> 43% of problems were CND ("cause not determined," presumably);

> 32% were caused by "rooting" (user modification of the phone);

> 11% were caused by a "FOTA Related failure" (from over-the-air software updates);

> Only **14%** were found to have been caused by a PMIC ("Power Management Integrated Circuit") failure, the technical term for a Random Shut Down Defect.

<u>Id.</u> Thompson failed to recognize or account for this breakdown in

the data and unreasonably conflated all power-related returns with
returns because of a Random Shut Down Defect.  Once again, it is
obvious that the document at issue does not permit the reasonable
conclusion that 100% of the Samsung Phones had a Random Shut Down
Defect.

c.  <u>Return Rates for the Samsung Phones</u>

The third major problem is that Thompson persistently ignores
the baseline return rates for the phones.  He emphasizes that
power-related problems accounted for a high percentage of <u>returns</u>,
but does not address those returns as a percentage of all phones
sold.

For example, Thompson relies on the previously cited Samsung
document for the proposition that, between August 2010 through
February 2011, "48% of all returned Captivate phones sold in the
United States were returned because of the Random Shut Down
Defect."  Thompson Report at 3-4.  As explained earlier, that
statement mischaracterizes the underlying data.  However, even if
it were true, it also fails to support his opinion that 100% of the
Samsung Phones had the defect.  In particular, he ignores page 3 of
that same document, Barnes Aff. Ex. D, which shows that between
August and December 2010, the return rate for the phones never
exceeded 1.08%.

Similarly, on page 4 of his report, Thompson cites the
"AT&T/Samsung Annual Quality Audit," dated June 29, 2011.  <u>See</u>

Barnes Aff. Ex. G. Page 11 of that document includes a chart showing reasons for the returns of the i897 model between September 2010 and June 2011, with the most frequent reason being "Phone Powers On/Off." As Thompson interprets it, this chart shows that "during this period, between 30 to 53% of all Captivate returned phones were because of the Random Shut Down Defect." Thompson Report at 4. Setting aside his conflation of "Phone Powers On/Off" with "Random Shut Down Defect," once again Thompson does not acknowledge that only a fraction of the phones produced before the November 2010 "fix" were returned and that fraction was greatly reduced after the "fix."

More specifically, it appears that Thompson deliberately excluded from his consideration information concerning the overall return rate. The relevant documents demonstrate that Samsung is correct in asserting that:

> Out of the total quantity that were manufactured before the Corrective Action, less than 5% were returned for a power-related reason. Out of the total quantity that were manufactured <u>after</u> the Corrective Action, less than 1.25% were returned for a power-related reason.

Memo. in Supp. of Mot. at 11 (footnotes omitted) (citing Second Rowden Aff. Ex. F). At his deposition, Thompson stated, without explanation, that he did "not consider [this document] as meaningful as the one[s] cited in [his] expert report." Thompson Dep. 110:4-6, Barnes Aff. Ex. J. Thompson's failure to recognize or address important data contributed to the conclusion that his

opinion that 100% of the phones were defective is obviously unreliable.

d.  Post-Remedy Defects

Thompson looks to three sources in support of his conclusion that the post-remedy Samsung Phones were also defective. However, his reading of these sources is selective. When properly read they do not support his ultimate conclusion.

The first such source is a May 26, 2011 email from a Samsung employee. See Barnes Aff. Ex. F. In that email, the employee indicated that, in a sample of twenty i897 units that had the November 2010 hardware remedy and had been returned two or more times, four phones, or 20%, "still exhibited power off symptoms." Id. Accordingly, the employee stated that "[b]ased on this result, HW improvement (CAP removal/replace) is not 100% effective and it is a contributing factor on bounce rate." Id. Thompson interprets this email as stating that "Samsung failed to [remedy the Random Shut Down Defect] even well after Plaintiff received her replacement Captivate Phone." Thompson Report at 6. However, Thompson again extrapolates too much from this information, ignoring the fact that the remedy was effective for 80% of the phones, including those that had already been returned twice.

The second such source is a March 30, 2011 email in which an AT&T employee refers to "Captivate power off issues on IMEI outside of the covered date range." Barnes Aff. Ex. E. Thompson again

claims that this email "confirms the fact that Samsung failed to cure the Random Shut Down Defect even well <u>after</u> Plaintiff received her replacement Captivate Phone." Thompson Report at 7. However, this source can only be reasonably read to support the narrower proposition that <u>some</u> of Samsung's phones with the November 2010 remedy had a Random Shut Down Defect.

Finally, Thompson claims that 1302 of 1699 Captivate phones, or 76.63%, manufactured in March 2011 were returned for some reason. <u>See</u> Thompson Report at 6 (citing Barnes Aff. Ex. H at 13). Although one chart does indicate that there were only 1699 Captivate phones produced in March 2011, two other documents produced to Thompson indicate that either 7000 or 73,831 Captivate phones were produced that month. <u>See</u> Memo. in Supp. of Mot. at 17-18; <u>see</u> <u>also</u> Second Rowden Aff. Ex. I at 9 (indicating 7000 Captivate phones manufactured in March 2011); <u>id.</u> Ex. H at 13 (indicating 73,831 Captivate phones manufactured in March 2011). Thompson's analysis does not address these discrepancies.

### e.    Lack of Independent Analysis

Finally, Thompson's conclusions are not based on any independent analysis of the Samsung phones at issue. Instead, he relies exclusively on his selective readings of the documents produced by Samsung and his observations of a single phone – Rothbaum's -- already known to have some kind of problem. To the extent that Thompson's conclusions could be corroborated by, for

example, taking an independent sample of Samsung Phones and determining whether they all have the defect, such testing was not done.

C. Conclusion

As the foregoing demonstrates, Thompson's report repeatedly draws conclusions that are not supported by the documents on which he relies. The court is mindful that "the <u>Daubert</u> regime should be employed only with great care and circumspection at the summary judgment stage." <u>Cortes-Irizarry</u>, 111 F.3d at 188. However, this is one of the rare, "clearcut" cases in which the record conclusively demonstrates that the expert's opinion will be inadmissible at trial. <u>Id.</u> As the Supreme Court has explained, "nothing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion that is connected to existing data only by the <u>ipse</u> <u>dixit</u> of the expert." <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. 136, 146 (1997). Similarly, the First Circuit has written that "trial judges may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable." <u>Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.</u>, 161 F.3d 77, 81 (1st Cir. 1998).

Here, Thompson's opinions are not supported by the data he cites, and they do not satisfy Rule 702's requirement that his "testimony [be] based on sufficient facts or data." Therefore, the

court is allowing the defendant's motion to exclude Thompson's report and testimony. "The expert's 'specialized knowledge' must 'assist the trier of fact to understand the evidence or to determine a fact in issue,'" Alves v. Mazda Motor of Am., Inc., 448 F. Supp. 2d 285, 298 (D. Mass. 2006), Thompson has not deployed his "specialized knowledge" in manner that would enlighten the jury. In essence, the plaintiff has not shown that "the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion." Ruiz-Troche, 161 F.3d at 81; see also BASF Corp. v. Sublime Restorations, Inc., 880 F. Supp. 2d 205, 213-14 (D. Mass. 2012). Therefore, in deciding the motion for summary judgment, the court is not considering Thompson's opinion that "100%" of the Samsung Phones were defective. See Irvine v. Mural Skin Res. Labs., Inc. 194 F.3d 313, 321 (1st Cir. 1999) ("Absent adequate factual data to support the expert's conclusions his testimony was unreliable.").

IV. SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is, therefore, appropriate only if there exists no factual dispute that is both "material" and "genuine." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

21

A fact is "material" if, in light of the relevant substantive law, "it has the potential of determining the outcome of the litigation." Maymi v. P.R. Ports Auth., 515 F.3d 20, 25 (1st Cir. 2008); accord Martinez-Rodriquez v. Guevara, 597 F.3d 414, 419 (1st Cir. 2010). "Only disputes over facts that might affect the outcome of the suit under the governing law properly preclude the entry of summary judgment." Liberty Lobby, 477 U.S. at 248.

To determine if a factual dispute is "genuine," the court must assess whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Chadwick v. WellPoint, Inc., 561 F.3d 38, 43 (1st Cir. 2009) (quoting Liberty Lobby, 477 U.S. at 248) (internal quotation marks omitted); Taylor v. Am. Chemistry Council, 576 F.3d 16, 24 (1st Cir. 2009). In making this determination, the court must "constru[e] the record in the light most favorable to the non-moving party." Douglas v. York Cnty., 433 F.3d 143, 149 (1st Cir. 2005); accord Montalvo v. Gonzalez-Amparo, 587 F.3d 43, 46 (1st Cir. 2009). However, "the evidence from the moving party as to specific facts can be accepted by the court where no contrary evidence is tendered by the party opposing summary judgment." Statchen v. Palmer, 623 F.3d 15, 18 (1st Cir. 2010) (citing LaFrenier v. Kinirey, 550 F.3d 166, 167 (1st Cir. 2008)).

The record should not be scrutinized piecemeal, but rather must be "taken as a whole." Matsushita Elec. Indus. Co., Ltd. v.

<u>Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

As explained earlier, evidence submitted in inadmissible form may be considered only if it could, at trial, be presented in admissible form. <u>See</u> Fed. R. Civ. P. 56(c)(2); <u>Gorski</u>, 290 F.3d at 475-76; <u>Vazquez</u>, 134 F.3d at 33.

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). However, the moving party's burden "may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." <u>Id.</u> at 325.

V.    FACTS

Construed in the light most favorable to the non-moving party, <u>Douglas</u>, the undisputed facts are as follows, except where genuine disputes are noted.

A.    <u>Plaintiff Rothbaum's Samsung Phones</u>

On October 16, 2010, Rothbaum purchased a Samsung Captivate phone, designated by Samsung as model i897, from an AT&T Store in Holyoke, Massachusetts.  <u>See</u> Rothbaum Decl. ¶3.[4]  "Within months"

_____

[4] This phone is generally referred to as Rothbaum's "original phone."  It was, however, actually the second such phone she purchased.  In her deposition, Rothbaum explained that she had purchased a Samsung Galaxy at a store in Merrick, New

of her purchase, the phone "began shutting down randomly." Id. ¶4.
The phone first shut down randomly in mid-December, 2010. See
Rothbaum Dep. 101:7-9. During a three-week period in December
2010, her phone shut down at least three times. See id. 108:22-24.

When her phone unexpectedly shut down while in sleep mode,
Rothbaum was required to press and hold the "On" button to restart
the phone. See id. 97:17 - 98:1. She did not, however, have to
remove and reinsert the battery before turning the phone back on.
See id. 109:5-9.

Rothbaum went to an AT&T service center in Hicksville, New
York in late December 2010 to complain about this problem. See id.
108:10-12. The representative performed a factory reset and gave
her a phone number to call in case the problems persisted. See id.
111:20-24.

Rothbaum's phone again shut down on or about January 3, 2011,
while "it was powered on and was in sleep mode." Rothbaum Decl.
¶5. Rothbaum then called AT&T, which sent her a replacement
battery, which she received in mid-January. See id. 114:8; see
also Rothbaum Decl. ¶¶7-8. As stated in Rothbaum's declaration,
even after she replaced the battery, the phone "continued to shut

---

York during Labor Day weekend in 2010. See Rothbaum Dep. 42:6-9.
However, she left that phone on top of her car, and it was
destroyed after being run over "by four cars and an ambulance."
See id. 68:2-3. It was after this incident that she purchased
the phone that first exhibited the alleged Random Shut Down
Defect.

down" from January 17-21, 2011.[5]  Id. ¶¶6, 9-10.  She described

these shutdowns as "annoying."  Rothbaum Dep. 120:1.

On or about March 1, 2011, Rothbaum went to the AT&T store in

Holyoke where she had purchased the phone and reported that her

problems were persisting.  See Rothbaum Decl. ¶11.  An AT&T

representative gave her the Replacement Phone which was same model.

See id.  Rothbaum cannot remember whether her original Samsung

phone was returned to AT&T.  See Rothbaum Dep. 126:5-21. In any

event, it has not been located.  Id.

"Within a day or two" of Rothbaum's having received the

Replacement Phone, the phone shut down randomly while in sleep

mode.  See id. 134:17-21.  Rothbaum reports that one such random

shutdown occurred on or about March 5, 2011.  See Rothbaum Decl.

¶14.  As with the original phone, Rothbaum only had to press the

"On" button to restart the Replacement Phone.  See Rothbaum Dep.

139:3-6.  She never needed to remove and reinsert the battery to

turn the phone back on.  See id. 171:6-9.

Rothbaum continued to use the phone for about eighteen months,

from March 2011 to September 2012, when she gave the Replacement

Phone to her attorneys for testing in connection with this case.

_____

[5] In her deposition, Rothbaum explained that many of the
dates listed in her declaration are rough approximations.  See
Rothbaum Dep. 147:10-16.

<u>See</u> Rothbaum Dep. 168:23-25; 174:17-23.[6]

During the time she used the Replacement Phone, it continued to shut down randomly while in sleep mode. Rothbaum testified that such shutdowns occurred "no more frequently than once a month." <u>See</u> Rothbaum Dep. 169:20-21. She also stated that the timing of the shutdowns was sporadic. She never had to remove the battery to restart the phone. <u>See</u> Rothbaum Dep. 171:4-9.

Rothbaum also loaded on the Replacement Phone and used several applications ("apps") that were not created by Samsung, including

---

[6] In the Plaintiff's Response to Defendants Rule 56.1 Statement of Undisputed Material Facts (Docket No. 129), Plaintiff objects to this statement, asserting that she was "denied the use of her Replacement Phone because it too was plagued by the Random Shut Down Defect which repeatedly caused the phone to randomly shut down on a continuous basis." <u>Id.</u> at 4. In support of this claim, Rothbaum cites page 134 of her deposition. <u>See</u> Rothbaum Dep. Tr. 134:17-21. Her testimony does not, however, support that assertion. Rather, that portion of her deposition indicates only that Rothbaum began experiencing shutdowns soon after she received her Replacement Phone.

In her declaration, Rothbaum also states that she provided the phone to her counsel on or about March 20, 2011. <u>See</u> Rothbaum Decl. ¶16. However, in her deposition, Rothbaum was asked, "[D]id you use your phone from March 2011 until September 2012?" and responded, "Yes, I did." Rothbaum Dep. Tr. 168:23-25. She also concedes that she continued to use her phone during this period in her memorandum in opposition to the motion for summary judgment. <u>See</u> Pl.'s Opp. to Mot. for Summ. J. at 10. In his report, Matthew Chung also noted that, when he examined the Replacement Phone in January, 2013, the phone's "modification record" indicated that the phone had been used as recently as July 3, 2012. <u>See</u> Chung Report ¶10. Therefore, the admissible evidence does not create a genuine dispute about the fact that Rothbaum used the Replacement Phone until at least July, 2012.

Facebook, Twitter, and Words with Friends.  See id. 128-30.  She also used several pre-loaded applications, such as Gmail.  See Rothbaum Dep. 128:3 to 133:5.

Rothbaum filed the initial complaint in this case on March 24, 2011, although she continued to use the phone until about September 2012.  On May 17, 2011, she sent Samsung a demand letter, pursuant to M.G.L. Chapter 93A.  See Rothbaum Dep. 188:11-18; Rowden Aff. Ex. C.  In response, Samsung offered to provide Rothbaum with a "new, fully functioning replacement." Id. 19:7-18; Rowden Aff. Ex. D at 3.

After negotiating with Rothbaum for the opportunity to test the Replacement Phone, Samsung had it inspected and tested by Matthew Chung, a senior engineer employed by Samsung in Korea.  See Chung Report ¶¶1-2.  Over three days in January 2013, Chung performed a variety of tests, including use of the phone in the ordinary way by checking apps and browsing the web, voltage measurements, and observation of the phone while it was in sleep mode.  See id. ¶¶4, 9.  During the testing, the phone did not randomly shut down, either in sleep mode or during active use.  See id. ¶11.  Based on his inspection of the phone's internal components, Chung concluded that the phone's circuitry was consistent with the manufacturing changes made in November 2010 to remedy the shutdown problem.  See id. ¶8. Chung concluded that the phone did not suffer from any shutdown defect, and stated that the

plaintiff's reported problems might be attributable to apps she had installed, such as Words with Friends. See id. ¶11. Rothbaum admits, rather than disputes, the results of the Chung testing. See Pl's Response to Def.'s Rule 56.1 Statement of Undisputed Material Facts at 4.

After Samsung returned the Replacement Phone to Rothbaum's counsel, Rothbaum retained Thompson, an electrical engineer, to test it and provide an expert opinion. According to Thompson's report (Barnes Aff. Ex. A), Thompson observed the phone for a six-day period, during which time the phone was generally kept in sleep mode. See Thompson Report at 7. By lightly pressing the "On" button on the phone, Thompson occasionally checked to see if the phone had shut down randomly. See Thompson Dep. 79:16-85:1, Barnes Aff. Ex. J. Thompson observed only one such shutdown, on the fifth day of observation. Thompson pressed the "On" button, which turned the phone back on. See id. 85:9-20. Based on these observations, Thompson concluded that the Replacement Phone was "defective because [it] randomly powered itself off when it was in sleep mode without any human intervention because of the Random Shut Down Defect." Id. at 8. As explained earlier, Thompson also reviewed a variety of Samsung documents and concluded that all of the Samsung Phones suffered from the Random Shut Down Defect.

However, as also explained earlier, his opinion is based upon an unreliable methodology, is not admissible, and may not be

considered in deciding the motion for summary judgment. In any event, as discussed below, even if admissible, Thompson's opinion is material only to limited aspects of Rothbaum's implied-warranty and Chapter 93A claims.

   B.   Evidence Concerning Problems with Samsung Phones

Between July 2010 and June 2011, Samsung produced at least 985,000 i897 Samsung Phones at issue in this case. See Tufaro Decl. Ex. B. In a February 1, 2011 technical service bulletin to AT&T, Samsung stated that "[a] small percentage of SGH-I897 handsets [the "Captivate" model of Samsung Phone] may exhibit a condition where the handset will power off after going to sleep mode." Tufaro Decl. Ex. D. The bulletin explained that this problem occurred only in phones within a certain range of IMEI numbers. See id. The service bulletin also explained that phone servicers should remove and replace certain capacitors to remedy the problem. See id.

There was a steady increase in the return rate for the Samsung i897 "Captivate" model between August 2010 and January 2011. See Tufaro Decl. Ex. E. In January 2011, 51.97% of returns were categorized under "Powers On/Off." Id. at 6-7. In a summary, one document states that:

> [Phone w]ill not wake up from sleep mode and powers off. Analysis showed that there was unwanted power-off in PMIC circuitry after large dV/dt on battery voltage and prevented device to [sic] wake up properly. SVC line will replace the current tantalum capacitor with a ceramic capacitor to prevent this failure. Starting

12/2010 Production.

Id. at 6.

This document also stated that, "[d]ue to growing concern" about these power-related issues, Samsung sampled 200 of the returned phones to determine the cause. It found that 43 units, or 22%, reproduced the powering-off symptom, and that all of these units had been produced before the "corrective action" was implemented on November 6, 2010. See id. at 9. Similarly, in a June 2011 internal report, Samsung noted that "[o]ut of 76,402 returns-to-date, only 6702 (8.8%) have been [from] production after November [2010,] even though 40% of production has been from this time[,] indicating improvement after HQ corrective actions were implemented." Second Rowden Aff. Ex. H at 13. Overall, Samsung's internal documents indicate that less than 5% of Samsung Phones produced before November 2010 were returned for any power-related reason and less than 1.25% of phones produced after the November 2010 remedy were returned for any power-related reason. See Second Rowden Aff. Ex. F.

The hardware fix was not completely successful, however. In an internal email from May 26, 2011, a Samsung employee stated that:

> [W]e sampled 20 i897 units with HW improvement applied (2nd time or more returned units + device manufactured after improvement date) and tested for power off.
>
> Result showed 4 unit[s], out of 20 units, still exhibited power off symptom (20%).

> Based on this result, HW improvement (CAP removal/replace) is not 100% effective and is a contributing factor on bounce rate.

Tufaro Decl. Ex. I.  Another Samsung employee responded that the cause of the continued problems with this subset of phones was unclear: "[D]o we know the root cause of the 20% failure?  Are these failures because the PMIC replacement is not effective or due to CVE complex repair quality?"  Barnes Aff. Ex. F.

VI.  DISCUSSION

The defendant seeks summary judgment on all three counts of the Second Amended Complaint.  First, the defendant argues summary judgment is required on Rothbaum's claim of a violation of the Massachusetts implied warranty of merchantability (Count I) because there is no evidence that the phone lacked its "operative essentials" and because the plaintiff impermissibly refused Samsung's offer of a fully functioning replacement phone.  Second, the defendant argues that summary judgment should be granted on Rothbaum's Chapter 93A claim (Count II) because her implied-warranty claim is meritless and because there is no evidence that Samsung made any misrepresentations on which relief can be granted.  Finally, the defendant argues, and plaintiff now agrees, that her implied-warranty claim under Texas law (Count III) should be dismissed because the plaintiff has failed to offer any evidence concerning why Texas law should apply here.

For the reasons explained below, Samsung's contentions are

meritorious.

A.   <u>Breach of Implied Warranty</u> (Count I)

Rothbaum claims that Samsung breached the implied warranty of merchantability under Massachusetts law by providing a defective phone.  The court finds that a reasonable factfinder would have to conclude that the Replacement Phone did not have an imperfection substantial enough to constitute a breach of the implied warranty of merchantability, and that even if the Replacement Phone did have a problem of that magnitude, the plaintiff has not shown that the defendant's proposed remedy – a fully functioning replacement phone – would fail of its essential purpose.  Therefore, the court finds that the defendant has demonstrated that summary judgment is appropriate on Count I.

   1.   <u>A Reasonable Jury Could Not Conclude</u>
        <u>that Rothbaum's Replacement Phone Lacked</u>
        <u>the "Operative Essentials"</u>

Samsung's primary argument is that Rothbaum's Replacement Phone does not have a problem that is sufficiently serious to breach the implied warranty of merchantability.  In particular, Samsung argues that Rothbaum's continued use of the Replacement Phone for 16 to 18 months after receipt indicates that it did not lack its "operative essentials."

As the standard for the implied warranty of merchantability has been recently and reliably summarized:

> Massachusetts' version of the Uniform Commercial Code
> provides that a "warranty that the goods shall be

merchantable is implied in a contract for their sale if
the seller is a merchant with respect to goods of that
kind." M.G.L. ch. 106, §2-314. To be merchantable,
goods must, among other things, be "fit for the ordinary
purposes for which such goods are used." M.G.L. ch. 106,
§2-314(2)(c). The level of review is not that of the
subjective expectations of the particular user, but the
reasonable expectations of an ordinary user or purchaser.
Wasylow v. Glock, Inc., 975 F. Supp. 370 (D. Mass. 1996);
see Venezia v. Miller Brewing Co., 626 F.2d 188, 190 (1st
Cir. 1980) ("question of fitness for ordinary purposes is
largely one centering around reasonable consumer
expectations").

BASF Corp. v. Sublime Restorations, Inc., 880 F. Supp. 2d 205, 217

(D. Mass. 2012).

As the Massachusetts Supreme Judicial Court has explained, the

implied warranty of merchantability does not require sellers to

provide flawless goods:

"The implied warranty of merchantability, . . . like that
of fitness, is primarily directed at the operative
essentials of a product. . . . It is not intended to
guarantee high quality or perfection of detail." Tracy
v. Vinton Motors, Inc., 130 Vt. 512, 516 (1972). "There
is no implied warranty that the goods shall be of the
best or even a very high quality." H. Alperin & R.
Chase, Consumer Rights and Remedies §68, at 158 (1979).

Hannon v. Original Gunite Aquatech Pools, Inc., 434 N.E.2d 611, 616

(Mass. 1982) (second alteration in original).

As explained earlier, there is substantial evidence concerning

the problems that Rothbaum had with her Samsung Phones. The phone

that she purchased on October 16, 2010, see Rothbaum Decl. ¶3,

first shut down randomly in mid-December 2010, about two months

later, see Rothbaum Dep. 101:7-9. During a three-week period in

December 2010, her phone shut down at least three times. See id.

33

108:22-24. Despite a reset of the phone and the replacement of the battery, her original phone continued to shut down randomly, which she found "annoying." Id. 120:1.

On March 1, 2011, Rothbaum returned to the AT&T store and exchanged her original phone for the Replacement Phone which is the focus of this case. See Rothbaum Decl. ¶11. A few days later, her Replacement Phone also shut down randomly. See id. ¶14. As with her original phone, the phone continued to shut down randomly while it was in "sleep" mode. Rothbaum stated that the random shutdowns happened "no more than once per month." See Rothbaum Dep. 169:20-21. As Rothbaum conceded at the hearing on August 28, 2014, there is no evidence in the record that she missed calls, emails, or other messages as a result of such shutdowns. Nor is there any other evidence to prove that she was injured by them.

For both the original and Replacement Phone, Rothbaum only needed to press and hold the "On" button to revive the phone; she did not, as alleged in the complaint, need to remove and then reinsert the battery. Compare id. 139:3-6, with Second Am. Compl. ¶22. Despite the random shutdowns, Rothbaum continued to use her Replacement Phone from March 2011 to about September 2012, when she provided the phone to her attorneys for testing, see id. 168:23-25; 174:17-23, or perhaps until July 2012, the last date on which the phone records indicate that the phone had been used, see Chung Report ¶10.

These facts, and the reasonable inferences that could be drawn from them, are insufficient to establish a violation of the implied warranty of merchantability.  Although the plaintiff has presented evidence that could permit a reasonable jury to conclude that her phones had a problem, the evidence does not permit a finding that the phones lacked the "operative essentials" such that they were not fit for their "ordinary purposes."  Hannon, 434 N.E.2d at 616.

Evidently because of the increasing proliferation of smartphones, there is a growing body of cases concerning the application of the implied warranty of merchantability to such devices.  As these cases indicate, the problem with Rothbaum's Replacement Phone caused her an inconvenience, but was not a flaw so great as to deprive her of the phone's "operative essentials." Id.

Generally, courts have found that when a plaintiff has only a minor problem with his or her phone, such an inconvenience is insufficient to prove a breach of the implied warranty of merchantability.  For example, in In re Google Phone Litigation, No. 10-CV-01177-EJD, 2012 WL 3155571 (N.D. Cal. Aug. 2, 2012), the plaintiffs alleged that their smartphones' data connections were inconsistent, leading to difficulty receiving or placing calls. The district court rejected this as a basis for a breach of the implied warranty, explaining that "[p]laintiffs' allegations that the phone drops or misses calls are insufficient to demonstrate

that this alleged defect is more than inconvenience or that the Plaintiffs cannot re-initiate these calls such that the phone is unfit for its ordinary purpose." In re Google Phone, 2012 WL 3155571, at *5. In re Google Phone is analogous to the instant case.

Other cases indicate that random shutdowns may in certain circumstances constitute a breach of the implied warranty of merchantability. However, they involved alleged problems that were materially more extreme than the problem experienced by Rothbaum. For example, in Horvath v. LG Electronics Mobilecomm U.S.A, Inc., No. 3:11-CV-01576-H-RBB, 2012 WL 2861160 (S.D. Cal. Feb. 13, 2012), the court denied the defendant's motion to dismiss, concluding that the plaintiffs had adequately alleged a breach of the implied warranty of merchantability:

> Plaintiffs contend that a cell phone that repeatedly shuts down, freezes, does not work unless a consumer repeatedly removes and replaces the battery, and bleeds light around the screen resulting in degraded images, may not be fit for its ordinary purpose. Plaintiffs allege that the power-off defect was not just inconvenient to Plaintiffs but rendered the G2X phones unusable for their intended purposes of making and receiving calls, messages, e-mails, alerts, and alarms. Moreover, Plaintiffs allege that the screen bleed defect resulted in degraded image quality, continually impacting the G2X phone's use and performance, including adversely impacting consumers' ability to watch videos or play games as intended and promoted on G2X phones. Further, all Plaintiffs sought out replacements because their phones failed to function properly or serve their intended purpose. As such, the Court concludes that Plaintiffs allege facts to make their claim for breach of the implied warranty of merchantability above the speculative level.

Horwath, 2012 WL 2861160, at *7 (citations omitted). Again, the court emphasized that the defects alleged were not merely "inconvenient," but rather injured the plaintiffs' ability to use their phones in a variety of ways. In the instant case, by contrast, the evidence viewed most favorably to Rothbaum indicates only that the shutdowns were infrequent and did not impede her ability to use her phone.

Similarly, in Taliaferro v. Samsung Telecomms. America, LLC, C.A. No. 3:11-CV-1119-D, 2012 WL 169704 (N.D. Tex. Jan. 19, 2012), the plaintiffs alleged that "their Galaxy S phones frequently shut down when they entered standby mode, and the phones would not power back on unless the user removed and reinserted the battery. Plaintiffs allege[d] that the defect manifested itself as many as ten times each day and caused users to lose data when their phones unintentionally powered off, id. at *1 (emphasis added). Although the court ultimately dismissed the UCC implied-warranty claim because of a failure to allege that Samsung had failed to repair or replace the phone, it noted in passing that "the factual basis for the claim is established by the pleadings." Id. at 5. The instant case is materially different because, unlike the shutdowns that allegedly occurred "ten times each day" in Taliaferro, Rothbaum experienced a shutdown no more than once per month, and there is no evidence that the shutdowns caused her to lose data, miss calls, or suffer any other harm.

As these cases indicate, in accord with the law in Massachusetts and other states that have adopted the UCC, a problem that causes only a mere inconvenience does not render a product is "unfit for [its] ordinary purposes" under M.G.L. Chapter 106, §3-214. See Finigan-Mirisola v. DaimlerChrysler Corp., No. 06-P-1168, 2007 WL 1977505, at *1 (Mass. App. Ct. July 9, 2007) ("Inconvenience in use of a particular product . . . do[es] not raise questions of merchantability."); see also Ferracane v. United States, No. 02-CV-1037(SLT), 2007 WL 316570, at *9 (E.D.N.Y. Jan. 30, 2007) (no breach of implied warranty under New York version of the UCC because "although the landing gear [on the plaintiff's tractor trailer] may not have been perfect, the alleged defect rarely evidenced itself and did not substantially detract from the overall quality of the product"); Baltazar v. Apple, Inc., No. CV-10-3231-JF, 2011 WL 3795013, at *3 (N.D. Cal. Aug. 26, 2011) (under California version of the UCC, "the plaintiffs had to show more than that the alleged defect was 'inconvenient,' rather, they had to show that the defect renders the defendant's computers unfit for their ordinary purpose" (citing Kent v. Hewlett-Packard Co., No. 09-5341 JF (PVT), 2010 WL 2681767, at *4 (N.D. Cal. July 6, 2010))).

Although the standard for determining whether the implied warranty has been violated is objective, see BASF, 880 F. Supp. 2d at 217, Rothbaum's continued use of the Replacement Phone for 16

to 18 months provides some evidence of the magnitude of the problem she experienced and the extent to which a reasonable user would find her phone unfit for ordinary use. See, e.g., Tietsworth v. Sears, Roebuck & Co., 720 F. Supp. 2d 1123, 1142-43 (N.D. Cal. 2010) (where plaintiff's washing machine allegedly stopped mid-cycle and had to be restarted, her continued use negated implied-warranty claim).

The evidence, viewed in the light most favorable to Rothbaum, would only permit a reasonable factfinder to conclude that the problem with her Replacement Phone caused her an inconvenience, but did not deprive her of its "operative essentials." Hannon, 434 N.E.2d at 616. This conclusion would not be altered if the court accepted, for purposes of summary judgment, the opinion of Kenneth Thompson that the Replacement Phone had a Random Shut Down Defect that was attributable to the defendant. Thompson did not offer any evidence concerning the extent to which such a defect affected the phone's "operative essentials." Therefore, his opinion would not alter the court's conclusion that any such defect in the phone constituted only an inconvenience to Rothbaum.

Accordingly, the court is allowing Samsung's motion for summary judgment with respect to Rothbaum's claim under the implied warranty of merchantability (Count I).

> 2. The Evidence Is Insufficient to Prove that Samsung's Proposed Remedy Would Fail of Its

<u>Essential Purpose</u>

Samsung also argues that, even if a jury could find that the Replacement Phone lacks the "operative essentials," it has not been given an adequate opportunity to provide a remedy because Rothbaum has refused its offer to provide her a fully functioning replacement phone. Samsung asserts that, because Rothbaum has alleged only economic loss and not personal injury, the harm to her can be cured by a repair or replacement under Samsung's express contractual warranty.[7]

---

[7] Samsung's express warranty states:

SAMSUNG TELECOMMUNICATIONS AMERICA, LLC ("SAMSUNG") warrants to the original purchaser ("Purchaser") that SAMSUNG'S phones and accessories ("Products") are free from defects in material and workmanship under normal use and service for the period commencing upon the date of purchase and continuing for the following specified period of time after that date: Phone: 1 Year . . . .

During the applicable warranty period, SAMSUNG will repair or replace, at SAMSUNG'S sole option, without charge to Purchaser, any defective component part of Product.

Rowden Aff. Ex. E at 190-92.

Rothbaum alleges that "[a]ny purported disclaimer or limitation of the implied warranty of merchantability on the part of Samsung is unconscionable and unenforceable because Samsung possessed actual, exclusive knowledge of the defect in the Samsung Phones at all relevant times as alleged herein." Second Am. Compl. ¶¶67, 90; <u>see</u> <u>also</u> M.G.L. ch. 106, §2-316A(2). However, in their memoranda and at the hearing on August 28, 2014, neither party addressed the validity of Samsung's warranty and remedy limitations. Therefore, any argument contesting the validity of Samsung's express warranty is waived. <u>See, e.g.</u>, <u>United States v. Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990).

With regard to an express warranty, the issue is whether Rothbaum improperly rejected Samsung's attempt to perform as warranted. M.G.L. Chapter 106, §2-719(2) cautions that, although certain warranty limitations, such as the repair-or-replace limitation, are permitted, "[w]here circumstances cause an exclusive or limited remedy to <u>fail of its essential purpose</u>, remedy may be had as provided in this subchapter," <u>id.</u> (emphasis added). "Courts have held that a repair-or-replace remedy fails of its essential purpose where the 'seller is either unwilling or unable to conform the goods to the contract.'" <u>Bos. Helicopter Charter, Inc. v. Agusta Aviation Corp., B.L.</u>, 767 F. Supp. 363, 373 (D. Mass. 1991). When a "repair-or-replace remedy deprives the buyer of minimum adequate remedies, the warranty will be said to have failed of its essential purpose," and the buyer is entitled to remedies under the UCC. <u>Id.</u>; <u>see</u> M.G.L. ch. 106, §2-719(2). "Whether a remedy has failed of its essential purpose is a question of fact." <u>Bos. Helicopter</u>, 767 F. Supp. at 373.

Rothbaum argues that Samsung's proffered remedy, a "fully functioning replacement" Captivate phone, fails of its essential purpose by depriving her of a minimum adequate remedy. <u>See</u> Opp. to Mot. for Summ. J. at 14-15. The plaintiff argues that the fact that the plaintiff's Replacement Phone was apparently defective, as well as the evidence concerning Samsung's general problems with defects with the Samsung Phones, creates a genuine issue of

material fact concerning whether Samsung could truly deliver a "fully functioning replacement." Rothbaum argues in effect that 100% of the Samsung Phones had a Random Shut Down Defect that violated the implied warranty of merchantability. Therefore, Rothbaum asserts that Samsung could not provide a fully functioning replacement.

The only information indicating that 100% of Samsung Phones shut down randomly is Thompson's opinion to this effect. As explained earlier, this opinion is based on a clear misreading, or distortion, of Samsung documents. It is not admissible. Therefore, there is no evidence that would permit a reasonable factfinder to conclude that Samsung could not have provided Rothbaum a fully functioning phone. The absence of admissible expert testimony alone is sufficient to require summary judgment for the defendant. See BASF, 880 F. Supp. 2d at 217-18; Alves v. Mazda Motor of Am., Inc. 448 F. Supp. 2d 285, 297 (D. Mass. 2006) ("Under Massachusetts law, where '[the nature of the defect of breach of warranty and its causal relation to the accident [are] complex,' a plaintiff must introduce expert testimony." (alterations in original) (quoting Hochen v. Bobst Grp, Inc., 290 F.3d 446, 451 (1st Cir. 2002))).

Moreover, the record must be taken as a whole rather than piecemeal. See Matsushita, 475 U.S. at 587. The records on which Thompson relied actually indicate that only about 5% of Samsung

Phones were returned for randomly shutting down originally, and that the fraction diminished to about 1.25% for phones manufactured after November 2010, when the manufacturing process was revised to address the problem.  See Second Rowden Aff. Ex. F.

Therefore, when all of the admissible evidence is viewed in the light most favorable to Rothbaum, a reasonable factfinder would be compelled to conclude that Samsung was capable of providing Rothbaum a fully functioning replacement phone.  This conclusion would provide a second basis to enter summary judgment for Samsung on Count I.[8]

---

[8] The defendant also argues that Rothbaum has not presented any "competent evidence" that her replacement phone was defective when she received it.  See Memo. in Supp. at 9.  In particular, the defendant argues that there is evidence that the plaintiff's use of various third-party applications on her Replacement Phone (including Facebook, Twitter, and Words with Friends) could plausibly be responsible for the random shutdowns.  However, if there were a problem with the Replacement Phone significant enough to violate the implied warranty of merchantability, a reasonable jury could draw the inference that the problem existed when Rothbaum received it.  The Replacement Phone began to shut down randomly within a day or two of its receipt.  See Rothbaum Dep. 134:19-21.  A reasonable jury could also infer that, because of the documentation concerning the existence of a similar problem in other phones, Rothbaum's Replacement Phone also had that problem.  Therefore, there is a genuine dispute of fact concerning whether her Replacement Phone was defective upon receipt.  However, because the court has determined that any defect in the plaintiff's phone was not serious enough to deprive her of the "operative essentials," this dispute is not material.

Finally, Samsung argues that the Replacement Phone does not have the defect that Rothbaum alleges.  See Memo. in Supp. at 11. Samsung notes that the Second Amended Complaint specifies that, in order to revive an affected phone after a random shutdown, the user must remove and then reinsert the battery before attempting to turn the phone on.  However, Rothbaum has consistently said

B.  Chapter 93A (Count II)

The defendant seeks summary judgment on Rothbaum's Chapter 93A claim (Count II).  She makes two distinct claims with respect to violations of Chapter 93A.  First, the plaintiff claims that the defendant's alleged breach of warranty also constitutes a violation of Chapter 93A.  See Second Am. Compl. ¶73.  Second, the plaintiff claims that the defendant violated Chapter 93A by "failing to disclose the existence of the Random Shut Down Defect."  Id. ¶72.  For the reasons explained below, the evidence construed in the light most favorable to the plaintiff is insufficient to prove either theory of liability.  Summary judgment is, therefore, being granted on Count II.

1.  Breach of Implied Warranty

Chapter 93A claims are equitable in nature and, therefore, are decided by a court rather than by a jury.  See Nei v. Burley, 446 N.E.2d 674, 679 (Mass. 1983).  Thus, the court is particularly capable of deciding whether a reasonable factfinder could conclude

---

that she could revive her phone simply by pressing the power button, and did not need to remove and reinsert the battery. Accordingly, Samsung argues that this discrepancy necessitates the entry of summary judgment.  However, in support of this argument, the defendant cites only a single case, Greene v. Ablon, C.A. No. 09-10937-DJC, 2012 WL 4104792 (D. Mass. Sept. 17, 2012), which does not stand for that proposition.  To the extent that there are other sources that support the defendant's argument on this issue, the defendant did not cite or otherwise rely upon them.  Here, the defendant failed "to spell out its arguments squarely and distinctly," as it is required to do. Zannino, 895 F.2d at 17.  Therefore, this argument has been waived. Id.

that a Chapter 93A violation could be proven.

As the Supreme Judicial Court explained in <u>Iannocchino v. Ford Motor Co.</u>, 888 N.E.2d 879 (Mass. 2008), where "[a]n implied warranty claim and a c. 93A claim are based on the same economic theory of injury and the same set of alleged facts, they should survive or fail under the same analysis," <u>id.</u> at 889. Indeed, Rothbaum recognizes this in alleging that "Defendant engage [sic] in unfair and deceptive business acts and/or practices in violation of M.G.L. c. 93A, §§2 and 9 by breaching the implied warranty of merchantability under to [sic] M.G.L. c. 106, §2-314." Second Am. Compl. ¶73.

The plaintiff does not dispute that the two claims are inextricably linked. <u>See</u> Opp. to Mot. for Summ. J. at 16-17. At the August 28, 2014 hearing, Rothbaum's counsel acknowledged that there could be no violation of Chapter 93A based on an alleged breach of warranty if summary judgment is granted for the defendant on Count I. Therefore, for the reasons stated for granting summary judgment on Count I, summary judgment is being granted with respect to the breach-of-warranty theory of liability under Chapter 93A.

### 2. Failure to Disclose

Rothbaum also contends that Samsung's failure to disclose the existence of the alleged Random Shut Down Defect to its customers constitutes a violation of Chapter 93A. The evidence, however, is insufficient to require a trial on this claim.

A defendant's failure to disclose known problems with its goods may in certain circumstances violate Chapter 93A. As the First Circuit has explained:

> Massachusetts courts have found inducement to purchase goods of "dubious reliability for the intended purpose" a violation of Chapter 93A, VMark [Software, Inc. v. EMC Corp.], 642 N.E.2d 587, 597 (Mass. App. Ct. 1994), and "[d]elivery of a defective product without revealing the defects, to the extent they are known and material" also a violation of Chapter 93A, id. at 596-97.

Saint-Gobain Indus. Ceramics Inc. v. Wellons, Inc., 246 F.3d 64, 73 (1st Cir. 2001).

> Unlike common fraud and misrepresentation, Chapter 93A imposes liability for material nondisclosure in transactions. See Urman v. S. Bos. Sav. Bank., 674 N.E.2d 1078, 1081 (Mass. 1997). It is a violation of the act to fail "to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction." 940 Mass. Code Regs. 3.16(2).

L.B. Corp. v. Schweitzer-Mauduit Int'l, Inc., 121 F. Supp. 2d 147, 154 (D. Mass. 2000). However, where the "asserted misconduct amounts to a failure to disclose a potential problem, not a present and actual one, [it] does not rise to the level of a chapter 93A violation." Id. (emphasis added). Liability will not arise under Chapter 93A "because of a suspicion or a likelihood, rather than knowledge." Underwood v. Risman, 605 N.E.2d 832, 835 (Mass. 1993).

As explained earlier, the plaintiff's proposed expert, Thompson opined that "100%" of the Samsung Phones are defective. In her opposition to the motion for summary judgment, the plaintiff relies exclusively on Thompson's opinion. See Opp. to Mot. at 17.

If admissible, Thompson's opinion would be sufficient to permit a reasonable factfinder to conclude that Samsung knew that Rothbaum's Replacement Phone was defective and nevertheless failed to disclose that to her. However, for the reasons explained earlier, Thompson's opinion is not admissible. As also explained earlier, decisions on motions for summary judgment must be based on admissible evidence. See Fed. R. Civ. P. 56(c)(2); Gorski, 290 F.3d at 475–76; Vazquez v. Lopez–Rosario, 134 F.3d at 33.

In the instant case, the admissible evidence in the record would permit a reasonable factfinder to conclude only that a small percentage of the Samsung Phones had a random shutdown problem. The admissible evidence, viewed in the light most favorable to Rothbaum, is only sufficient to prove that Samsung knew of a potential defect in some of the Samsung Phones. It is undisputed that, upon learning of the problem, Samsung changed the way it manufactured its phones to attempt to remedy the problem and continued to test its devices to determine the remedy's efficacy. See Tufaro Decl. Ex. E at 9. That change reduced the return rate for power-related problems from 5% to 1.25%. See Second Rowden Aff. Ex. F. This, among other things, strongly indicates that only a small percentage of the Samsung Phones that included Rothbaum's Replacement Phone experienced power related problems. Samsung was not required to disclose this potential problem to Rothbaum. Compare L.B. Corp., 121 F. Supp. 2d at 154 (no violation where

alleged failure to disclose was based on defendants' knowledge of potential problems with land caused by known chemical spill), with Heller v. Silverbranch Constr. Corp., 382 N.E.2d 1065, 1068-70 (Mass. 1978) (defendant knew of drainage problem), and Mackesy v. Fotopoulos, No. 1411, 2002 WL 971812, at *4 (Mass. App. Div. May 7, 2002) (defendant knew of vehicle's mechanical problems), and Slaney v. Westwood Auto, Inc., 322 N.E.2d 768, 778 (Mass. 1975) (defendant allegedly knew or should have known of engine defect).

The undisputed fact that the defendant implemented manufacturing changes to remedy the potential problem with the Samsung Phones also contributes to the conclusion that, when viewed as a whole, the evidence is insufficient to prove a violation of Chapter 93A. In Logan Equipment Corp. v. Simon Aerials, Inc., 736 F. Supp. 1188 (D. Mass. 1990), this court found that there was no Chapter 93A liability where the defendant sent the plaintiff a prototype boomlift "despite doubts as to its functionality," noting that "delivery of the allegedly faulty unit was indisputably followed by continued attempts to design and manufacture a satisfactory unit, rather than by other allegedly unfair and unscrupulous acts, further eliminating the possibility of unethical motives on the part of the defendants," id. at 1204. The court reaches a comparable conclusion in this case.

As noted earlier, liability under Chapter 93A cannot be imposed "because of a suspicion or a likelihood, rather than

knowledge." Underwood, 605 N.E.2d at 835. Here, the evidence in the record indicates that, in view of the undisputed fact that the November 2010 manufacturing change was largely successful, Samsung knew only that there was a low likelihood that the Replacement Phone might have a random shutdown problem. The record, therefore, is not sufficient to prove that Samsung had actual knowledge of a material defect in the Replacement Phone. Therefore, the admissible evidence is not sufficient to support a finding that the defendant was engaged in "conduct that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." Mass. Sch. of Law v. ABA, 142 F.3d 26, 46-47 (1st Cir. 1998); see also Logan Equip. Corp, 736 F. Supp. at 1203-04. Accordingly, the court is allowing the defendant's motion for summary judgment on this theory of liability.

C.    Texas Law (Count III)

Finally, the defendant argues that the court should now dismiss Count III, which alleges a breach of implied warranty under Texas law. In denying the motion to dismiss, the court reserved judgment on this issue. See May 31, 2012 Order at 1 (Docket No. 39). Samsung argues that "the State of Texas bears no reasonable relationship to the Plaintiff's transaction," Memo. in Supp. of Mot. for Summ. J. at 19, and that under Massachusetts choice-of-law rules, Texas law does not apply. Samsung also argues that, even if Texas law were to apply, the plaintiff's claim would still fail

because "the central allegations of the Plaintiff's [Texas] UCC claim are the same as those of her UCC claim under Massachusets law." Id. at 20.

At the August 28, 2014 hearing, the plaintiff conceded that Count III should be dismissed. Therefore, because the plaintiff consents to the dismissal of Count III, and because the defendant's arguments in favor of summary judgment on that count appear to be meritorious, the court is dismissing Count III.

VII. ORDER

In view of the foregoing, it is hereby ORDERED that:

1. Defendant Samsung Telecommunications America, LLC's Motion to Preclude the Expert Report of Ken Thompson (Docket No. 90) is ALLOWED.

2. Defendant Samsung Telecommunications America, LLC's Motion for Summary Judgment (Docket No. 88) is ALLOWED.

3. Judgment shall enter for defendant.

                              /s/ MARK L. WOLf
                              UNITED STATES DISTRICT JUDGE